**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **RHODE ISLAND FISHERMEN'S ALLIANCE, INC., by and through its President, RICHARD FUKA, STEVEN RILEY, individually, BRIAN LOFTES, individually, STEPHEN MEDERIOS, individually, GREG DUCKWORTH, individually, VINCENT CARVALHO, individually, PETER DIBIASE, ESQ., individually, ROBERT MORRIS, individually, and ANDREW CAVANAGH, individually,** ***Plaintiffs*** | : | |
| **v.** | : | **C.A. NO. 1:07 – cv – 230** |
| **THE DEPARTMENT OF ENVIRONMENTAL MANAGEMENT And W. MICHAEL SULLIVAN, PH.D. In his capacity as the Director of the Rhode Island Department of Environmental Management** ***Defendants*** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF COMPLAINT FOR DECLARATORY JUDGMENT AND MOTION FOR PRELIMINARY INJUNCTION**

Respectfully submitted,
Plaintiffs,
By their attorney,

/S/ Robert J. Caron
Robert J. Caron, Esq. 5735
55 Bradford Street, Ste 203
Providence, RI 02903
Phone: (401) 621-8600
Fax (401) 274-2480
rcaron@caronolenlaw.necoxmail.com

## FACTS

The facts are contained in Plaintiffs' complaint filed in the above entitled action and are incorporated herein by reference as though set forth in full.[1]

## TRAVEL OF THE CASE

1. On June 4, 2007 Plaintiffs filed a Complaint for Declaratory Judgment and a Motion for a Preliminary Injunction in the Providence Superior Court.
2. On June 21, 2007, Defendants Department of Environmental Management and Michael Sullivan removed the case to the Federal District Court for the District of Rhode Island and answered the complaint on June 25.
3. On June 27, 2007 the Plaintiffs filed a Motion to Remand, which was denied on November 5, 2007.
4. On July 20, 2007 the Atlantic States Marine Fisheries Commission filed a Motion to Intervene. The Court granted the motion on November 5, 2007.
5. On July 27, 2007 the Rhode Island Lobstermen's Association filed a Motion to Intervene. The motion was granted on November 5, 2007.
6. A final pretrial conference was held on November 14, 2007.

[1] All references made to Appendix (App.) are made to the Appendix Plaintiffs previously submitted to the Court in this case.

## ARGUMENT

### I. THIS COURT SHOULD DECLARE THE DEPARTMENT OF ENVIRONMENTAL MANAGEMENT'S (DEM) LOBSTER TRAP ALLOCATION REGULATORY SCHEME UNLAWFUL AND VIOLATIVE OF RHODE ISLAND'S CONSTITUTION AND SHOULD GRANT PLAINTIFF'S COMPLAINT FOR PRELIMINARY INJUNCTION

#### *a. Standard For Declaratory Judgment and Preliminary Injunction*

Under the Uniform Declaratory Judgment Act, Rhode Island Superior Court "shall have the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." R.I.G.L. § 9-30-1. The purpose of this act "is to facilitate the termination of controversies." Fireman's Fund Ins. Co. v. E.W. Burman, Inc., 391 A.2d 99, 101 (R.I. 1978) (citations omitted); Capital Props., Inc. v. State, 1999 R.I. Super. LEXIS 24, *21 (1999).

In determining whether to issue a preliminary injunction, "the hearing justice should determine whether the moving party (1) has a reasonable likelihood of success on the merits, (2) will suffer irreparable harm without the requested relief, (3) has the balance of the equities, including the possible hardships to each party and to the public interest, tip in its favor, and (4) has shown that the issuance of a preliminary injunction will preserve the status quo." Iggy's Doughboys, Inc. v. Giroux, 729 A.2d 701, 705 (R.I. 1999).

The moving party seeking a preliminary injunction "must demonstrate that it stands to suffer some irreparable harm that is presently threatened or imminent and for which no adequate legal remedy exists to restore that plaintiff to its rightful position." The Fund For Community Progress v. United Way of Southern New England, 695 A.2d 517, 521 (R.I. 1997). When balancing the equities, a court should consider "the hardship

to the moving party if the injunction is denied, the hardship to the opposing party if the injunction is granted, and the public interest in denying or granting the requested relief." Id. at 521. The moving party must only make out a *prima facie* case when showing a likelihood of success on the merits, and not prove a certainty of success. Id.

***b. Plaintiffs Have And Will Continue To Suffer Irreparable Harm.***

This Court should grant the Plaintiffs' request for a preliminary injunction. Without the requested relief, the Plaintiffs have suffered and will continue to suffer irreparable harm in the form of lost income and the denial of their constitutionally guaranteed right to equal access to the fisheries. Here, Plaintiffs have the same commercial fishing licenses as interveners Rhode Island Lobstermen's Association. Based on arbitrary and capricious regulations adopted by DEM, one group of licensees is awarded lobster trap tags while the other group receives none or comparatively fewer tag allocations. If the preliminary injunction is not granted, Plaintiffs will be denied the use of their lobster traps and valid commercial fishing licenses to fish for lobster. Because of this imminent threat of irreparable harm, the balance of equities tips in favor of the Plaintiffs. Furthermore, because the Lobster Trap Allocation regulatory scheme at issue here was adopted in the spring of 2007, it represents a recent change in the Department of Environmental Management regulations and, therefore, a preliminary injunction will preserve the status quo. The Plaintiffs will demonstrate in the following sections that they have a reasonable likelihood of success on the merits.

## II. R.I.M.F. REGULATION 15.14.2-6 AND 6.7-8 (a) SHOULD BE DECLARED UNCONSTITUTIONAL AS VIOLATIVE OF RHODE ISLAND'S CONSTITUTION, ARTICLE 1§17.

***a. The Regulation Which Plaintiffs Are Challenging***

1. Under the regulatory scheme adopted by DEM, to qualify for Area 2 Lobster Trap Allocation (LTA) an individual who possessed a commercial lobster license must have had a valid license or federal permit endorsed for Area 2 during the period of 2001-2003, i.e., must have landed lobsters with traps from Area 2 at some point during that period. See Rhode Island Marine Fisheries Regulations (R.I.M.F.Reg) Rule 15.14 2-6 (a) (i) (ii). Further, the licensee must have "Renewed his/her license/permit annually since 2003." Id. at (a) (iii).

2. R.I.M.F.Reg 6.7-8(a), entitled "Issuance of New Licenses Upon Sale of Vessel and Gear," provides for the transfer and sale of commercial licenses as follows:

> that if the seller of a vessel and gear who is actively fishing his or her license shall have first surrendered it to the Department***, the Department will, upon application, issue one new license to the purchaser of the vessel and gear, pursuant to the terms and conditions of this section.*** (emphasis added)

3. Moreover, R.I.M.F.Reg 15.14.2-11, entitled "Transfer of Area 2 LTAs," is a forecast of Defendant Director's intention to provide for transferability of Area 2 LTAs among permit holders.

***b. The Regulations Violate Rhode Island's Constitution***

Article I § 17 of the Rhode Island Constitution states that "The people shall ***continue to enjoy and freely exercise all the rights of the fishery***, and the privileges of the shore, to which they have been heretofore ***entitled under this charter*** and usages of this state." R.I. Const. Art. I, § 17 (emphasis added). This provision of the Rhode Island Constitution is unique to Rhode Island, in that it is the only state that deems such right to

the fishery as fundamental.[2] Furthermore, this provision embodies and codifies what King Charles II set out in the Charter of Rhode Island and Providence Plantations. Article 1 § 17 states that "[t]he people shall continue to enjoy and freely exercise all rights of fishery, and the privileges of the shore, to which they have been heretofore entitled under the charter and usages of this state. . ." Specifically, the Charter states in relevant part:

> [p]rovided also, and our express will and pleasure is, and we do by those presents, for us, our heirs and successor, ordain and appoint that these presents, shall not, in any manner, hinder any of our loving subjects, whatsoever, from using and exercising the trade of fishing upon the coast of New England, in America; but that they, and every or any of them shall have full and free power and liberty to continue and use ***the trade of fishing*** upon the said coast.

Royal Charter of the State of Rhode Island, 1663, (hereinafter "Charter") (emphasis added).

Article I §17 of Rhode Island's Constitution "leaves the rights of fishery and privileges of the shore, where they were. It neither diminishes nor adds to them." State v. Medbury, 3 R.I. 138, 143 (1855). The significance of the right to the fisheries predating the Constitution, is that it was not a created right. It was a preexisting right that was already vested in the people and is not subject to selective exclusion. Equally important is to appreciate that part of those preexisting rights was to "continue the ***trade*** of fishing," a clear reference to commercial use and constitutionally protected livelihood to pursue the trade of fishing.

Although Article I § 17 gives the state the power to provide for the conservation of the fisheries resource, this power is not unlimited. The limit on the legislature's power

[2] The only other state with a similar provision is Alaska, which, unlike Rhode Island, explicitly qualifies the right to the fisheries as subject to "the power of the state to limit entry into any fishery for purposes of resource conservation, to prevent economic distress among fishermen and those dependent upon them for a livelihood, and to promote the efficient development of aquaculture in the State." Because of this qualifier, the Alaska Constitution specifically allows for the legislature to protect those in the fishery at the expense of others. To the contrary, Rhode Island's Constitution specifically forbids such discrimination.

to control the fisheries was exemplified in 1958 when the Rhode Island Senate requested an Advisory Opinion from the Supreme Court regarding the General Assembly's power, under the provisions of the Rhode Island Constitution, to prohibit commercial fishermen from taking striped bass from Rhode Island waters. The Court stated that "the constitution gives the benefits of the fishery ***to all people in equal measure***." Opinion to the Senate, 137 A.2d 525, 525-26 (1958) (emphasis added). The Court further noted that:

> neither do we understand that the purpose of one question submitted is to inquire whether the legislature may permit one class of citizens to take fish while prohibiting entirely the taking thereof by another class of citizens, as for example those who resort to fishery for commercial purposes. Did we so understand the question; we would answer it in the negative, since a statute of such purport would be invalid as discriminatory.

Id. at 526.

In State v. Constantine Kofines et al., the Supreme Court upheld Public Law 473 §§ 1 and 2, which required anyone taking lobster from Rhode Island waters to hold a valid license. 80 A. 432, 433 (R.I. 1911). The Kofines court found the public law constitutional because "no duly qualified citizen has been refused a license to fish for the people's lobsters in the public water of the state…all qualified applicants for such fishing licenses have received them." Id. at 241-42.

However, unlike the nondiscriminatory public law at issue in Kofines, the DEM's LTA regulatory scheme, which allocates lobster traps based on landings during a three year period, denies plaintiffs their right to equal access to the fisheries as guaranteed by Article I § 17 of the Rhode Island Constitution. The LTA regulatory scheme arbitrarily denies a group of citizens, namely those commercial fishing license holders who did not land a substantial or any catch at all of lobster while using their lobster traps from 2001 to 2003. Though this regulatory scheme was adopted by the ASMFC, Rhode Island's

unique Constitution does not permit the adoption of such discriminatory regulations by DEM. Moreover, as previously argued to the Court in Plaintiffs' Memorandum of Law in Response to Proposed Intervener's Supplemental Memorandum to the Court, filed September 14, 2007, Rhode Island officials could have proffered a conservation equivalency scheme which would not have offended Rhode Island's Constitution.[3] This Court should declare the LTA regulatory scheme unconstitutional and issue a preliminary injunction enjoining its continued implementation.

## III. STRICT SCRUTINY ANALYSIS MUST BE APPLIED TO THE LTA REGULATORY SCHEME

Because Rhode Island's unique Constitution makes equal access to the fisheries a fundamental right, the LTA regulatory scheme is subject to strict scrutiny analysis. "Strict scrutiny is applied when a statute's differential treatment of a select class of persons either infringes upon the fundamental rights or results in the creation of a suspect classification." Boucher v. Sayeed, 459 A.2d 87, 91 (R.I. 1983). When strict scrutiny is the appropriate standard, "discrimination can only be justified by a compelling state interest." Id. The Rhode Island Supreme Court has made clear that "[i]f a statute or regulation contained restrictions that infringed upon the fundamental right of the inhabitants of the state to have equal access to the 'rights of the fishery,' then such a regulation or law would be subject to strict scrutiny analysis." Cherenzia v. Lynch, 847 A.2d 818, 824 (R.I. 2004). Here, there are groups of commercial fishermen who have the

[3] Plaintiffs have already argued strenuously that the State had alternative conservation equivalency options under the ASMFC's charter and Amendment 3 (The Lobster Plan). Plaintiffs incorporate this memo by reference here as though set forth in full. Although this Court ruled that Plaintiffs' complaint raised a question of federal law, this Court has not yet ruled on the merits of Plaintiffs' claims. In looking to the merits, Plaintiffs simply seek to demonstrate that the state had alternatives available to it.

same licenses to fish commercially, yet some are wholly excluded from fishing for a valuable resource, lobster, based on arbitrary historic landings.

In Cherenzia, the Rhode Island Supreme Court examined the constitutionality of a statute which prohibited any person from harvesting shellfish using scuba gear from four specified coastal ponds. The court did not apply strict scrutiny because the statute did not "infringe on the fishermen's ***fundamental right to equal access*** to the state's resources." Id. at 824. (emphasis added) The statute in question prohibited all people from using scuba equipment, and, therefore, did not deny equal access to any particular group. They could all still fish for the resource in equal measure. It was only the methodology which was regulated.

In contrast to the statute at issue in Cherenzia, which denied everyone the right to use scuba gear in certain coastal ponds, the LTA regulatory scheme ***does*** deny a particular group of persons equal access to the fisheries. The LTA regulatory scheme denies those who cannot demonstrate significant landings or as to some, any landings of lobster through the use of their lobster traps from 2001 to 2003. Because the plaintiffs and others similarly situated are denied equal access, a fundamental right under Rhode Island's constitution, strict scrutiny must be applied.

The LTA regulatory scheme cannot survive strict scrutiny because DEM does not have a compelling interest in distributing LTA's based on the size of a license-holder's catch from 2001 to 2003. Indeed, all the state has done here is protect and insulate a particular user group of commercial fishermen who seek to preserve enhanced emolument at the expense of those similarly situated. This, Article 1, Section 17 does not permit. Rhode Island's Supreme Court has interpreted Section 17 to mean that "fishing must be carried out for the ultimate benefit of the people of the state and not merely for

the profit and emolument of the fishermen engaged in the business." Id. quoting Opinion to the Senate, 87 R.I. at 38-39, 137 A.2d of 526. Thus, Article 1 section 17 insures equal access to the resources among all user groups, not a select privileged few. Any interest that DEM has in protecting lobster population in Area 2 may be accomplished through nondiscriminatory means.

***a. The LTA Regulatory Scheme Should Be Struck Down Even if Rational Basis Analysis is Applied***

When applying a rational basis test, a court needs to determine "whether the differential treatment bears a reasonable or rational relationship to a legitimate state interest." Boucher, 459 A.2d at 91. Under a rational basis test, a court will overturn a statute when "the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the legislature's actions were irrational." Gregory v. Ashcroft, 501 U.S. 452, 471 (1991).

Article 1 Section 2 of Rhode Island's Constitution states in relevant part that "[a]ll free governments are instituted for the protection, safety and happiness of the people. All laws, therefore, could be made for the good of the whole; and the burdens of the state ought to be fairly distributed among its citizens." In determining whether a statute or law is arbitrary or capricious, it is well settled that a classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." Reed v. Reed, 404 U.S. 71, 76 (1971). Here, the retroactive control dates chosen to determine the allocation of lobster trap tags, the period from 2001 to 2003, are arbitrary and capricious and bear no rational relationship to

DEM's ostensible interest in protecting the Area 2 lobster population. To so randomly choose a control date which excludes those already licensed with equal expectations to be able to fish for a resource, sounds squarely of arbitrary and capricious classifications. Moreover, as discussed *infra*, such retroactive control dates of exclusion violate R.I.G.L. § 20-2.1-9 on its face.

The standard for determining whether such legislation violates this provision, which is essentially a guarantee of equal protection of the laws, is whether the challenged statute is a capricious exercise of lawmaking power. Warwick v. Almac's, 442 A.2d 1265, 1270 (R.I. 1982). For example, in Warwick the Rhode Island Supreme Court upheld a Sunday-closing law with an exemption for small businesses because the statute's distinction between large and small retailers had a rational basis and was not arbitrary and capricious. Id. at 1267. The court reasoned that:

> the legislature could reasonably find that by limiting the size of stores that may open on Sunday, commercial activity is minimized and the number of citizens enjoying a day of rest is maximized, while products or services necessary or desirable for the enjoyment of the day are still available.

Id. at 1271.

Unlike the Sunday-closing law at issue in Warwick, where the distinction between large and small retailers was rationally related to the statutory purpose, the retroactive control dates that determine the allocation of lobster traps under the LTA regulatory scheme, are not in any way related to the goal of protecting the lobster population. Indeed, the scheme impermissibly protects and insulates one user group.[4] Therefore, the control dates are a capricious exercise of power and violate Article I § 2 of

[4] As the intervening Rhode Island Lobstermen's Association has argued, "If the plaintiffs' allegations are successful, there will in all likelihood be some sort of reallocation of the traps that are available for individuals fishing in Rhode Island waters for lobster. This will most likely result in Defendant-Interveners' [sic] receiving a smaller allocation of traps and thereby reducing their ability to make a living." See Memorandum in Support of Motion of Rhode Island Lobstermen's Association, p.3.

the Rhode Island Constitution. Therefore, the LTA regulatory scheme passes neither strict scrutiny nor any rational basis analysis and should be declared unconstitutional. This Court should declare the LTA regulatory scheme unconstitutional and enjoin the DEM from its continual implementation.

## IV. DEM'S USE OF PLAINTIFFS' LOG BOOKS TO EXCLUDE THEIR EQUAL ACCESS TO THE LOBSTER RESOURCE IS A PLAIN VIOLATION OF RHODE ISLAND LAW

R.I.G.L. § 20-7-9, entitled "Report of lobsters taken," states as follows:

> For the purpose of determining whether the number of lobsters caught in the waters of this state are increasing or decreasing during any period, every person licensed pursuant to § 20-2-24 to catch, take, and/or sell lobsters in Rhode Island shall, upon request of the department of environmental management, report catch and effort statistics upon form furnished by the department. The returns from any person shall not be made public, shall be kept only in the files of the department, and ***shall be used only for statistical purposes***. (emphasis added)

The LTA regulatory scheme provides that "[d]ocumented fishing performance shall be based upon a license/permit holder's logbook reports and for federal VTRs (vessel trip reports) pertaining to the applicable qualifying period." R.I.M.F. Reg. 15.14.2-6(c). In other words, the logbooks are now being used to determine who among the commercial lobster license holders gets to fish for lobsters in Rhode Island waters.

This regulation is a clear violation of R.I.G.L. § 20-7-9, which specifically prohibits use of logbooks except for statistical purposes. In absence of an ambiguity, Rhode Island courts must give the words of the statute their plain and literal meaning. State v. Oliveira, 432 A.2d 664, 666 (R.I. 1981). The plain and literal meaning of the term "statistical purposes" does not and could not possibly include using the information to determine who will receive the allocation of lobster trap tags. Because the LTA

regulatory scheme violates R.I.G.L § 20-7-9, this Court should declare the scheme unlawful and enjoin the DEM from its continued implementation.

## V. IN ADOPTING R.I.M.F.R. 15.14.2-6 AND 6.7-8(a), THE DIRECTOR OF DEM HAS ACTED CONTRARY TO HIS STATUTORY AUTHORITY

In 2002, the Rhode Island Legislature passed on an enabling statute outlining the power and duties of the Director of DEM in adopting a commercial fisheries licensing system. Pursuant to the enabling statute, the Director was to:

> Establish prospective control dates that provide notice to the public that access to, and levels of participation in, a fishery may be restricted and that entrance into, or increases in levels of participation in a fishery after the control date may not be treated in the same way as participation in the fishery prior to the control date; ***retroactive control dates are prohibited and shall not be used or implemented***, unless expressly required by federal law, regulation or court decision…

R.I.G.L. § 20-2.1-9(4)(ii) (emphasis added).

The LTA regulatory scheme, enacted in 2007, which utilizes the retroactive control dates of 2001 to 2003 to determine how many lobster trap tags are allocated to each applicant in 2007, is in clear violation of R.I.G.L. § 20-2.1-8(4)(ii), which specifically forbids the use of retroactive control dates, unless expressly required by federal law, regulation or court decision. Again, as previously argued in Plaintiffs' Memorandum of Law in Response to Proposed Intervener's Supplemental Memorandum to the Court, any compliance with the "Plan" did not require the adoption of the offending regulations. Here, no federal law, regulation or court decision requires the use of retroactive control dates in a lobster trap tag allocation scheme. In accepting jurisdiction on the merits of Plaintiffs' claims, this Court has stated that it must "look to Rhode Island's and ASMFC and its progeny, the Atlantic Coastal Fisheries Act and any

applicable regulation and/or procedures," to decide the case. Memorandum and Order, Honorable Chief Justice Lisi, C.A. No. 07-230ML, November 5, 2007, p. 10. Once the Court looks to these forecasted sources, the conclusion should be clear that the regulations adopted by DEM were not mandatory.

## VI. ADDENDA SUCH AS LOBSTER ADDENDUM VII, ARE NOT "COASTAL FISHERY MANAGEMENT PLANS" AS DEFINED BY ACFCMA AND ARE NOT, THEREFORE, ENFORCEABLE UNDER THE ACT

ACFCMA defines a "coastal fishing management plan" as "a plan for managing coastal fishing resource, or *an amendment* to such a plan, prepared and *adopted* by the Commmission." 16 U.S.C. § 5102 (1) (emphasis added). Under ACFMCA, such a plan must "provide for conservation[5] of coastal fishing resources" and "specify the requirements necessary for States to be in compliance with the plan." Id. § 5104(a)(1). By its plain terms, the definition excludes addenda, like Addendum VII.

However, this distinction is more than simply semantic. An addendum results from an abbreviated rulemaking process undertaken pursuant to what is known as "adaptive management." Under the Charter, a management board may include an adaptive management process within an FMP or formal amendment for the species it regulates. Adaptive management allows "for changes within the management program to adapt to changing circumstances," which changes are memorialized "in writing through addendum to the fishery management plan." See Charter, Section Six(b)(3), App. 29. Adaptive management is thus defined as "[a]n interactive process which includes evaluation of the response of the managed fishery and stock to ***specific management***

[5] "The term 'conservation' means the restoring, rebuilding, and maintaining of any coastal fishing resource and the marine environment, in order to assure the availability of coastal fishery resources on a long-term basis." 16 U.S.C. § 5102(4).

***measures*** and adjusting ***such measures*** based on the evaluation." Id. Section Eight(c), App. 35 (emphasis added). In other words, the abbreviated adaptive process is designed to be an efficient means for varying existing management measures (the existence of which is a condition precedent to the use of adaptive management) in response to an anticipated, pre-determined set of exigencies in order to insure that the plan's goals and objectives are met on an ongoing basis.

Adaptive management is, as a result, strictly limited in terms of the circumstances under which it may be employed and the action it may require states to undertake. Indeed, the Charter further mandates that, "FMPs which provide for adaptive management ***shall identify specifically the circumstances under which adaptive management changes may be made***, the types of measures that may be changed, the schedule for state implementation of changes, and the procedural steps necessary to effect a change." Id. Section Six (b)(3) (emphasis added). These limitations are appropriate because addenda developed through this abbreviated process become effective upon final approval by a management board, with no review or action by the commission as a whole Id. (c)(7).

By contrast, ACFCMA only applies to plans and amendments "***adopted*** by the Commission." 16 U.S.C. § 5102(1) (emphasis added). By their own terms, and in the case of Lobster Addendum VII (addendum becomes final on action of Lobster Board), addenda are not approved or adopted by the Commission. Therefore, addenda are not governed by the terms of ACFCMA.

**a.** ***ACFCMA Does Not Require Adoption Of Specific Measures***

Even if this Court were to find, and it should not, that Addendum VII does fall within the ambit of ACFCMA, that law does not require adoption of any specific

measures, such as those at issue in this case. Under ACFCMA, "the coastal fishery management plan shall specify the requirements necessary for States to be in compliance with the plan." 16 U.S.C. § 5104(a)(1). Furthermore, each member state, "with respect to a coastal fishery management plan, shall implement and enforce the measures of such plan within the timeframe established in the plan." Id. §5104(b)(1). Plaintiffs note once again, that this language refers to "plans", as they are defined in the Act, and those do not include addenda not adopted by the Commission.

More to the point, however, all the ACFCMA does is to require compliance with the "required measures" of a plan (i.e. those that are "specified" pursuant to 16 U.S.C. § 5104(a)(1)), and the plan more generally. As previously argued to the Court (See ft. note 3, *supra*), the Plan does not make the key provisions at issue "mandatory elements." Moreover, as also shown, the Plan allows for conservation equivalency. Rhode Island could have stayed perfectly within the confines of the Plan and ACFCMA by proposing an alternative that was legal under state law.

That it chose not to do so, does not mean that this case is controlled by ACFCMA. It only means that if Plaintiffs succeed, then the state will have to propose an alternative that will be judged as being equivalent by the Board. If no accommodation is reached, then there are additional processes that the ASMFC will have to go through to find the State out of compliance. Only then will ACFCMA Sections 5105 and 5106 come into operation. These sections provide for more process and opportunities for negotiated agreement before consequences, such as a closure of the fishery, become a possibility.

In short, ACFCMA does not mandate any state to adopt any particular measure. Rather, it calls for states to be in compliance with the terms of a Commission-passed plan or amendment or risk certain consequences. It has no operation in this case, which is

about certain non-mandatory measures passed as an addendum, which Plaintiffs believe violate the Rhode Island constitution.

## VII. REGULATIONS ADOPTED BY DEM VIOLATE R.I.G.L. § 42-35-3

R.I.G.L. § 42-35-3 states:

> Prior to the adoption, amendment, or repeal of any rule the agency shall…demonstrate the need for the adoption, amendment, or repeal of any rule in the record of the rulemaking proceeding. The agency shall demonstrate that there is no alternative approach among the alternatives considered during the rulemaking proceeding which would be as effective and less burdensome to affected private persons as another regulation.

DEM did not demonstrate, prior to adopting the LTA regulatory scheme, that there were no equally effective and less burdensome alternatives. In fact, Connecticut and New York have adopted alternative conservation measures which have been approved by the ASMFC's American Lobster Management Board. See, Atlantic States Marine Fisheries Commission News Release, August 14, 2007, App. 97. Furthermore, the ASMFC has indicated that the control dates, 2001-2003, are an optional element of the LTA plan. See, Addendum VII, App. 84. Therefore, DEM had the option of adopting conservation equivalency measures, in lieu of adopting the ASMFC's LTA recommendations, yet it chose not to consider alternatives as other states have. Other states which do not share the unique state constitutional provision peculiar to Rhode Island. See *supra*, ft. nt. 2.

The DEM's failure to consider conservation alternatives violated R.I.G.L. § 42-35-3 and this Court should declare the LTA regulatory scheme unlawful and enjoin DEM from its continued implementation.

### a. *Alternative Methods Should Have Been Considered Pursuant to Rhode Island's Requirement That Adoptive Agency Regulations Should be Mindful of Potential Adverse Impact on Small Businesses.*

R.I.G.L. § 42-35-2.2 states that "[p]rior to the adoption of any proposed regulation each agency shall…consider using regulatory methods that will accomplish the objectives of applicable laws while minimizing adverse impact on small business."

Here, the Plaintiffs' small businesses have been severely affected, disabled and disenfranchised as a direct result of the DEM's LTA regulatory scheme. As discussed above, DEM failed to consider conservation alternatives that would minimize adverse impact on small business. The DEM violated R.I.G.L. §42-35-2.3 and the court should declare the LTA regulatory scheme unlawful and enjoin DEM from its continued implementation.

## VIII. THE DIRECTOR ACTED BEYOND THE SCOPE OF HIS LEGISLATIVE GRANT OF AUTHORITY AND IT IS ANTICIPATED BY CLEAR REGULATORY FORECASTING THAT HE WILL CONTINUE TO DO SO IF NOT ENJOINED

R.I.G.L. § 20-2.1-9, entitled "Power and Duties of the Director," grants the Director authority to promulgate regulations for commercial fishing licenses. There is nothing within this enabling legislation, which provides for the creation and/or transfer of rights of access to the public marine resource.

R.I.M.F. Reg. 6.7-8(a), entitled "Issuance of New Licenses Upon Sale of Vessel and Gear," provides for the transfer and sale of commercial licenses as follows:

> that if the seller of a vessel and gear who is actively fishing his or her license shall have first surrendered it to the Department, ***the Department will, upon application, issue one new license to the purchaser of the vessel and gear, pursuant to the terms and conditions of this section*** (emphasis added).

Moreover, R.I.M.F. Reg. 15.14.2-11, entitled "Transfer of Area 2 LTAs" and currently pending, is proof of Defendant Director's intention to provide for the transferability of LTAs among permit holders.

By allowing for and encouraging the transfer, exchange and purchase of LTAs, the Director is creating a private property right of access to marine resources and allowing private individuals to determine who may have access to public resources based on sale to the highest bidder. R.I.G.L. § 20-2.1-9 does not grant the Director the authority to turn a public resource into the basis for a private bidding war. Because the Director exceeded the scope of his authority in implementing the LTA regulatory scheme, the Court should declare the scheme unlawful and enjoin it from being implemented.

## CONCLUSION

For the foregoing reasons, the Plaintiffs' complaint for declaratory judgment and motion for preliminary injunction should be granted.

Respectfully submitted,
Plaintiffs,
By their attorney,

/S/ Robert J. Caron

Robert J. Caron, Esq. 5735
55 Bradford Street, Ste 203
Providence, RI 02903
Phone: (401) 621-8600
Fax (401) 274-2480
rcaron@caronolenlaw.necoxmail.com

## CERTIFICATION

I hereby certify that this document has been filed electronically on 18th day of January, 2008, and is available for viewing and downloading from the ECF system.

/S/ Robert J. Caron

Robert J. Caron, Esq. 5735
55 Bradford Street, Ste 203
Providence, RI 02903
Phone: (401) 621-8600
Fax (401) 274-2480
rcaron@caronolenlaw.necoxmail.com