February 14, 2008

**Supreme Court**

No. 2006-175-Appeal.
(PC04-987)

Steven Riley :

v. :

The Rhode Island Department of Environmental Management et al. :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

PDF created with pdfFactory trial version www.pdffactory.com

February 14, 2008

**Supreme Court**

No. 2006-175-Appeal.
(PC04-987)

Steven Riley :

v.

The Rhode Island Department of :
Environmental Management et al.

Present: Williams, C.J., Flaherty, Suttell, and Robinson, JJ.

# OPINION

**Justice Flaherty, for the Court.** Does the Rhode Island Constitution's guarantee of right of fishery prohibit the Legislature from granting some commercial fishermen access to some species of sea life while denying others the same rights? This is a constitutional challenge to the Rhode Island General Assembly's 2002 enactment of a limited-entry fishing licensing statutory scheme that empowered the Rhode Island Department of Environmental Management (DEM) to adopt a flexible approach to issuing new licenses for restricted species on a yearly basis.[1] Steven Riley (Riley) appeals from a Superior Court judgment in favor of DEM after Riley appealed a denial of a principal-effort license to commercially fish certain restricted species, pursuant to the Administrative Procedures Act (APA), G.L. 1956 § 42-35-15.[2] Riley

---

[1]Because G.L. 1956 chapter 2.1 of title 20 has remained virtually identical in substance since its enactment in 2002 (P.L. 2002, ch. 47, § 4), we do not distinguish between the statutes throughout this opinion. For more background on the general topic, see Matthew Lansford and Laura S. Howorth, Legal Impediments to Limited Entry Fishing Regulation in the Gulf States, 34 Nat. Resources J. 411 (1994).

[2] General Laws 1956 § 42-35-15 reads in relevant part:



PDF created with pdfFactory trial version www.pdffactory.com

also moved in the Superior Court for declaratory relief,[3] arguing that the General Assembly's enactment of G.L. 1956 § 20-2.1-5[4] was unconstitutional because it limited the issuance of "new" principal-effort and multipurpose fishing licenses while preserving the licenses of fishermen who were issued those licenses prior to December 31, 2002.[5] Riley brought forth a barrage of constitutional challenges against the statute, as well as against Rule 7 of the Rules and Regulations Governing the Management of Marine Fisheries, that was adopted by the DEM pursuant to the General Assembly's statutory authority.[6]

The eye of this storm revolves around (1) whether the denial of a preferred license to Riley, which would grant him access to the same restricted species as other, more highly licensed fishermen, implicates a fundamental right of fishery or a fundamental right to pursue a common

---

> "(a) Any person, including any small business, who has exhausted all administrative remedies available to him or her within the agency, and who is aggrieved by a final order in a contested case is entitled to judicial review under this chapter."

[3] Section 42-35-7 reads:

> "The validity or applicability of any rule may be determined in an action for declaratory judgment in the superior court of Providence County, when it is alleged that the rule, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the plaintiff. The agency shall be made a party to the action. A declaratory judgment may be rendered whether or not the plaintiff has requested the agency to pass upon the validity or applicability of the rule in question."

[4] General Laws 1956 § 20-2.1-5 states in relevant part:

> "The director shall establish as a minimum the following types of licenses set forth in this section. In addition, the director may establish any other classes and types of licenses and endorsements, consistent with the provisions of this chapter and with adopted management plans, that may be necessary to accomplish the purposes of this chapter * * *."

[5] Furthermore, according to the APA, the agency appeal to the Superior Court must be brought to this Court via a petition for certiorari; because it was not, we will address only the direct appeal of the Superior Court's judgment with respect to declaratory relief. See G.L. 1956 § 42-35-16.

[6] See G.L. 1956 chapter 17.1 of title 42, G.L. 1956 § 20-1-4, chapter 2.1 of title 20, chapter 35 of title 42, and P.L. 2002, ch. 47. Rule 7, at the time of Riley's application to DEM, stated that there were no new principal-effort or multipurpose licenses for 2003, but commercial licenses were available.



PDF created with pdfFactory trial version www.pdffactory.com

occupation of life, and (2) whether § 20-2.1-5 comports with the requirements of due process and equal protection under the Rhode Island and United States Constitutions. We affirm the judgment of the Superior Court.

**Facts and Procedural History**

This fish story began when Riley applied to DEM for a principal-effort license, which would grant him access to Rhode Island's most valuable sea fare. Riley claims he was a commercial fisherman in Rhode Island in the 1970s. He left this profession to pursue a career in engineering, and did not renew his license thereafter. Three decades later, in February 2003, Riley, his engineering pursuits completed, decided to return to his original calling. Specifically, Riley sought a principal-effort commercial fishing license with shellfish/quahog and restricted-finfish endorsements under § 20-2.1-5. This particular license would enable Riley to have access to the restricted fisheries sectors, which included six species of finfish, one species in the shellfish category (quahogs), and one species in the crustacean category (lobster).

Before the "Commercial Fishing Licenses Act of 2002" was enacted, the state alternated between periods of "open access" in licensing and enacting moratoriums.[7] After an intense, collaborative effort among DEM, the Intergovernmental Working Group on Fisheries Management, the Coastal Institute at the University of Rhode Island, and other affected stakeholders, the Legislature enacted legislation that enabled DEM to place "[r]estrictions on the number of license holders" and adjust the number of new licenses issued, on a yearly basis, depending on the status of the species.[8] Section 20-2.1-2(6)(ii)(E).

---

[7] Margaret E. Petruny-Parker et al., Development of the "Commercial Fishing Licenses Act of 2002" – A New Approach, 8 Roger Williams U. L. Rev. 135, 136, 137 (2002).

[8] Petruny-Parker, 8 Roger Williams U. L. Rev. at 135-36. We note that the parties often refer to this legislation as a moratorium; however, a moratorium is defined as: "1. An authorized postponement * * *. 2. The period of this delay. 3. The suspension of a specific activity."



PDF created with pdfFactory trial version www.pdffactory.com

According to the statute, there are three types of fishing licenses available. The entry-level license is a "Commercial fishing license" that allows for "commercial fishing in the fisheries sector, per endorsement at basic harvest and gear levels."[9] Section 20-2.1-5(1)(i). The second type is the principal-effort license, which was Riley's preference. However, he was not eligible because:

> "[d]uly licensed persons in a fishery as of December 31 of the immediately preceding year, shall be eligible to obtain a principal effort license for the fishery sector for which they were licensed on December 31 of the immediately preceding year, which principal effort license shall allow its holder to fish in a

---

Blacks Law Dictionary 1026 (7th ed. 1999). This situation is unlike the moratoriums that were enacted from 1995-1998 and 2000-2001, which prohibited any new licenses for specific periods. See G.L. 1956 § 20-2-1.1. Today, § 20-2.1-5(3)(iii) provides in pertinent part:

> "Availability of new or additional licenses. New principal effort and multi-purpose licenses that increase the total number of licenses in the fishery may be made available by rule consistent with management plan for issuance effective January 1, in any year, based on status of resource and economic condition of fishery."

[9] Section 20-2.1-3 provides in pertinent part:

> "(4) 'Crustaceans' means lobsters, crabs, shrimp, and for purposes of this chapter it also includes horseshoe crabs.
>
> "* * *
>
> "(6) 'Endorsement' means the designation of a fishery in which a license holder may participate at either basic or full harvest and gear levels. Endorsement categories and levels shall be established annually by the department by rule, based on the status of the various fisheries, the levels of participation of existing license holders, and the provisions of applicable management plans or programs. At a minimum, endorsement categories and endorsement opportunities shall include, but may not be limited to: non-lobster crustacean; lobster; non-quahaug shellfish; quahaug; non-restricted finfish; and restricted finfish. Endorsements, when available shall be issued in accordance with applicable qualifying criteria.
>
> "(7) 'Finfish' means cold-blooded aquatic vertebrates with fins, including fish, sharks, rays, skates, and eels and also includes, for the purposes of this chapter, squid.
>
> "(8) 'Fisheries sectors' means and comprises crustaceans, finfish, shellfish, as defined in this section, each of which shall singularly be considered a fishery sector.
>
> "* * *
>
> "(10) 'Shellfish' means quahogs, clams, mussels, scallops, oysters, conches, and mollusks in general other than squid."



PDF created with pdfFactory trial version www.pdffactory.com

> fishery sector at the full harvest and gear levels. * * * Principal effort license holders, in addition to the fishery sector of their principal effort, shall be eligible to obtain endorsements for the other fishery sectors at the full harvest and gear levels * * *." Section 20-2.1-5(1)(ii).

Eligibility for the third type of license, the "Multi-purpose license," similarly is limited to:

> "[a]ll multi-purpose license holders as of December 31 of the immediately preceding year, * * * which shall allow the holder to engage in commercial fishing in all fisheries sectors at the full harvest and gear levels." Section 20-2.1-5(1)(iii).

Because Riley did not have a valid principal-effort or multipurpose license before December 31, 2002, his application was denied by the DEM. However, he was granted the less lucrative commercial fishing license, and he later secured a lobster endorsement.

Dissatisfied, on March 9, 2003, Riley filed a request that the Commercial Fishing License Review Board (CFLRB) reconsider his application for the principal-effort license. He was told that the board had not yet been appointed; so, on May 21, 2003, Riley requested a hearing with the Administration Adjudicative Division (AAD). In June, the AAD remanded the case to the CFLRB for a hearing, which was held on July 21, 2003. After the hearing, Riley's appeal was denied by the CFLRB and the DEM. On January 21, 2004, the parties presented oral arguments before Chief Hearing Officer Kathleen Lanphear, who granted DEM's motion for summary judgment on January 26, 2004. Riley timely appealed to the Superior Court pursuant to the APA, §§ 42-35-15 and 42-35-7.

In his complaint, Riley raised thirteen issues, including his contention that § 20-2.1-5 was unconstitutional, and the agency's denial of his desired license was in error. Among the myriad allegations set forth in his complaint, he argued that his fundamental right to earn a livelihood in a lawful calling and his fundamental right of fishery were violated, that grandfathering old licenses while refusing to issue new licenses created two classes of people and denied members



PDF created with pdfFactory trial version www.pdffactory.com

of one of those classes equal protection and due process, that the administrator's grant of summary judgment was arbitrary and capricious, and that the DEM regulations created a monopoly in favor of a group of fishermen, in violation of antitrust law.

The Superior Court affirmed the DEM's decision, applying a rational-basis test to the constitutional challenges because it determined that no fundamental right was implicated. The Court found that the General Assembly had legitimate goals to "[p]reserve, enhance, and allow for any necessary regeneration of the fisheries of the state, for the benefit of the people of the state, as an ecological asset and as a source of food and recreation," and limited entry was a rational way to achieve those goals. Section 20-2.1-2(1). Finally, the Court found that the antitrust claims were meritless. Riley timely appealed.

On appeal to this Court, Riley narrows his arguments to constitutional claims, and he attempts to trigger this Court's strict scrutiny of the statutory framework by arguing that denying him a principal-effort license infringes on his fundamental right to pursue a lawful calling. Riley also argues that § 20-2.1-5 implicates a fundamental right of fishery as found in the Rhode Island Constitution, denying him equal access to fish the desired species with other commercial fishermen, in violation of equal protection and due-process considerations. He argues that these statutes cannot withstand a strict-scrutiny analysis, but that even under a rational-basis analysis, they still fail because they are arbitrary and capricious and are not designed to achieve a legitimate governmental goal.

The state counters that the licensing statute and implementing regulations do not infringe upon any fundamental right and a limited-entry scheme is rationally related to the legitimate purposes outlined in § 20-2.1-2.



PDF created with pdfFactory trial version www.pdffactory.com

**Standard of Review**

When the decision of a trial justice or of the agency is based upon questions of law, we review those findings de novo. Johnston Ambulatory Surgical Associates, Ltd. v. Nolan, 755 A.2d 799, 805 (R.I. 2000).

In passing on the constitutionality of a statute, this Court will exercise "the greatest possible caution." Cherenzia v. Lynch, 847 A.2d 818, 822 (R.I. 2004) (quoting Gorham v. Robinson, 57 R.I. 1, 7, 186 A. 832, 837 (1936)). It is the petitioner's burden, to prove beyond a reasonable doubt, that the act violates a specific provision of the Rhode Island or the United States Constitutions. Cherenzia, 847 A.2d at 822 (citing City of Pawtucket v. Sundlun, 662 A.2d 40, 45 (R.I. 1995)). In fact, there is a presumption that the statute is "valid if good upon its face, and it is presumed that the acts of the judicial body which granted it are all valid. 'Omnia praesumuntur rite et solemniter esse acta.' They are presumed to know the law and to have followed it in case of each necessary step." Payne & Butler v. Providence Gas Co., 31 R.I. 295, 327-28, 77 A. 145, 158 (1910). It is the duty of the Legislature, however, to act within "the textual limitations * * * that are specified in the Federal or State Constitutions." Cherenzia, 847 A.2d at 822 (quoting Sundlun, 662 A.2d at 44).

In construing provisions of the Rhode Island Constitution, our "chief purpose is to give effect to the intent of the framers." In re Advisory Opinion to Governor (Ethics Commission), 612 A.2d 1, 7 (R.I. 1992) (citing State ex. rel. Webb v. Cianci, 591 A.2d 1193, 1201 (R.I. 1991)); Bailey v. Baronian, 120 R.I. 389, 391, 394 A.2d 1338, 1339 (1978); Opinion of the Court to the House of Representatives, 45 R.I. 289, 293, 120 A. 868, 870 (1923). The historical context is important in determining the scope of constitutional limitations because "'a page of history is worth a volume of logic.'" In re Advisory Opinion to the Governor, 688 A.2d 288, 291 (R.I.



PDF created with pdfFactory trial version www.pdffactory.com

1997) (quoting Kass v. Retirement Board of Employees' Retirement System, 567 A.2d 358, 360 (R.I. 1989) and Justice Oliver Wendell Holmes in New York Trust Co. v. Eisner, 256 U.S. 345, 349 (1921)). Therefore, this Court properly consults extrinsic sources, including "the history of the times and examine[s] the state of affairs as they existed when the constitution was framed and adopted." Sundlun, 662 A.2d at 45 (citing In re Advisory Opinion to the Governor, 612 A.2d at 7).

We "employ the well-established rule of construction that when words in the constitution are free of ambiguity, they must be given their plain, ordinary, and usually accepted meaning." Sundlun, 662 A.2d at 45 (citing In re Advisory Opinion to the Governor, 612 A.2d at 7). Moreover, "every clause must be given its due force, meaning and effect and that no word or section must be assumed to have been unnecessarily used or needlessly added," and we must "presume the language was carefully weighed and its terms imply a definite meaning." In re Advisory Opinion to the Governor, 612 A.2d at 7 (quoting Kennedy v. Cumberland Engineering Co., 471 A.2d 195, 198 (R.I. 1984) and Bailey, 120 R.I. at 391, 394 A.2d at 1339).

**Equal Protection and Due Process**

Riley argues that denying him the principal-effort license violates his right to earn a livelihood in a lawful calling and engage in a common occupation of life, as protected by the liberty provision of the due process clause. See U.S. Const. Amend. XIV, sec. 1; R.I. Const. art. 1, sec. 2; see also Berberian v. Lussier, 87 R.I. 226, 231, 139 A.2d 869, 872 (1958) (citing State v. Dalton, 22 R.I. 77, 86, 46 A. 234, 237 (1900)). Furthermore, Riley argues that limiting the issuance of new licenses implicates his rights of fishery because it denies a class of citizens equal access to fishery, offending our constitutional guarantee of "equal protection of the laws." See U.S. Const. Amend. XIV, sec. 1; R.I. Const. art. 1, sec. 2.



PDF created with pdfFactory trial version www.pdffactory.com

The threshold question that must be addressed before we can determine the constitutionality of the statute is whether a fundamental right is in play. If so, in that case the statute will be subject to strict scrutiny; however, where neither a suspect class nor a fundamental right is implicated, then the legislation properly is analyzed under a minimal-scrutiny test. Under those circumstances, this Court will review the statute to insure that "a rational relationship exists between the provisions of [the statute] and a legitimate state interest. Under this analysis, if we can conceive of any reasonable basis to justify the classification, we will uphold the statute as constitutional." Cherenzia, 847 A.2d at 825 (citing Kennedy v. State, 654 A.2d 708, 712-13 (R.I. 1995)).

Because Riley does not argue that a suspect classification exists, we focus on determining whether his fundamental right to engage in a lawful calling or his right of fishery under the Rhode Island Constitution are implicated, thereby mandating the rejection of minimal scrutiny, as outlined above, in favor of a stricter standard.

**The Right to Earn a Livelihood in a Lawful Calling**

Riley argues that granting him a commercial fishing license, instead of the principal-effort license that he sought, violates his fundamental right to engage in a lawful occupation. The due process clause says "nor shall any state deprive any [citizen] of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, sec. 1; see R.I. Const. art. 1, sec. 2. The Rhode Island Supreme Court has recognized that,

> "Liberty, as meant by the clause, is a broad concept including not only freedom from bodily restraint but also the right of the individual to contract, the right of the individual to engage in the common occupations of life, to acquire useful knowledge, to marry, and generally to enjoy privileges long recognized as essential to the orderly pursuit of happiness by a free people." In re Advisory Opinion to the House of Representatives Bill 85-H-7748, 519 A.2d 578, 581 (R.I. 1987) (citing Board of Regents of State Colleges v. Roth, 408 U.S. 564, 572 (1972)); see also Berberian, 87 R.I. at 231, 139 A.2d at 872 (the liberty which is



PDF created with pdfFactory trial version www.pdffactory.com

guaranteed to every person by both our state and federal constitutions includes the right to be free from unreasonable interference in the pursuit of a livelihood).

However, in our opinion, this statute does not frustrate Riley's fundamental right to pursue a lawful calling because Riley concedes that he has a license to fish commercially. This Court cannot agree that Riley has a fundamental right to have the specific license he seeks, which would allow him to take more valuable species of fish. We do not believe that this is an unreasonable regulation on Riley's ability to be a commercial fisherman because he still is able to harvest more than a hundred species of sea creatures, even though he is unable to pursue those that are the most profitable, except in a recreational manner. Riley may still fish commercially within the licensing scheme and applicable restrictions that the statute requires. See Cherenzia, 847 A.2d at 824.

Furthermore, we think it is instructive that this Court has held that the General Assembly's power to regulate marine fisheries is broad and plenary. See Cherenzia, 847 A.2d at 822. To uphold its constitutional duty to protect and maintain the fisheries in Rhode Island, we have said that the General Assembly "may even prohibit free fishing for a time and for such times as in their judgment it is for the best interest of the State so to do." Opinion to the Senate, 87 R.I. 37, 39, 137 A.2d 525, 526 (1958) (quoting Payne & Butler, 31 R.I. at 327, 77 A. at 158). Therefore, we hold that no fundamental right to engage in a lawful calling is implicated when a licensing scheme merely limits the type of species commercial fishermen may pluck from the sea.

When no fundamental right is at issue, substantive due process "guards against arbitrary and capricious government action." Kaveny v. Town of Cumberland Zoning Board of Review, 875 A.2d 1, 10 (R.I. 2005) (quoting Brunelle v. Town of South Kingstown, 700 A.2d 1075, 1084 (R.I. 1997)). To prove a violation of substantive due process, Riley must show that the



PDF created with pdfFactory trial version www.pdffactory.com

provisions of the law are "'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.'" Id.; see also Baffoni v. State, 118 R.I. 226, 233, 373 A.2d 184, 188 (1977) (citing State v. Lombardi, 104 R.I. 28, 31, 241 A.2d 625, 627 (1968)).

To overcome this difficult burden, Riley argues that the qualifying criteria for a principal-effort license, namely, possessing a license prior to December 31 of the preceding year, utterly is unconnected to the public's health, safety, morals, and general welfare.[10] Riley relies upon Baffoni, to argue that these prerequisites are arbitrary and unreasonable. In Baffoni, the plaintiff was trained as an electrologist at an out-of-state school, but she was ineligible to take the licensing exam enabling her to practice in Rhode Island. Baffoni, 118 R.I. at 230, 373 A.2d at 186. The plaintiff's application to practice electrology was denied because she had not fulfilled a statutory requirement of 650 hours of training with a Rhode Island electrologist. Id. This Court held that the prerequisite violated her right to due process because it was arbitrary and unreasonable, and bereft of any substantial relation to the stated goals of safety. Id. at 235-36, 373 A.2d at 189. However, unlike Baffoni, in which the plaintiff was denied a license to practice at all, here Riley does have a commercial fishing license. Furthermore, we think that the requirement of possessing a license from the previous year has a real and substantial relationship to a legitimate governmental goal of limiting the number of licenses available to take restricted species. Although the date set forth in the statute, December 31, 2002, may seem like an arbitrary line in the sand, it is not unreasonable to give priority to fishermen, according to who already depended on this limited resource for their livelihood.

[10] We note that there may be other ways to be eligible for this license, even if one does not have a license the preceding year, but we will address the merits of Riley's argument against this particular requirement.



PDF created with pdfFactory trial version www.pdffactory.com

**Historical Background to the Right of Fishery in Rhode Island**

The second issue to be determined by this Court is whether a fundamental constitutional right of fishery is involved. The right of fishery in Rhode Island has deep historical roots and can be traced back to approximately 1639, when a scarcity of provisions threatened our small population with imminent famine. Samuel Greene Arnold, 1 History of the State of Rhode Island and Providence Plantations 142-43 (1859). After all the existing food stuffs were divided among the hundred or so inhabitants, "'a general assembly of the freemen' at Newport voted that 'all the sea banks were declared free for fishing.'" 2 State of Rhode Island and Providence Plantations at the End of the Century: A History, The Sea Trade and its Development 389, 393 (Edward Field ed. 1902) (quoting Arnold's History of Rhode Island, at 143). Open fishery has been credited by many scholars as the means that avoided impending disaster at that time.

"Equal freedom was thus granted to all inhabitants of the colony to fish in the waters of the bay, and this right was perpetuated, and extended to include the shores likewise, by the King Charles II charter of 1663." Id. at 393. Indeed, the Royal Charter is noteworthy for its establishment of a variety of freedoms, and it included the following specification critical to our present analysis:

> "Provided also, and our express will and pleasure is, and we do, by those presents, for us, our heirs and successors, ordain and appoint that these presents, shall not, in any manner, hinder any of our loving subjects, whatsoever, from using and exercising the trade of fishing upon the coast of New England, in America; but that they, and every or any of them, shall have full and free power and liberty to continue and use the trade of fishing upon the said coast, in any of the seas thereunto adjoining, or any arms of the seas, or salt water, rivers and creeks, where they have been accustomed to fish * * *." The Royal Charter (granted by King Charles II, July 8, 1663, and in force until the Constitution, adopted in November, 1842, became operative on the first Tuesday of May, 1843).

In 1842, the Rhode Island Constitution was ratified, and significantly, it incorporated the rights of fishery from the Royal Charter. However, it is noteworthy that this right was



PDF created with pdfFactory trial version www.pdffactory.com

augmented in 1970, with an amendment entitled "Conservation," in which the previous provisions with respect to the right of fishery were annulled and replaced. See R.I. Const. amend. 37, secs. 1, 2.

The complexity and precarious balance of the values sought to be preserved by article 1, section 17 of the Rhode Island Constitution is demonstrated by the following 175 word sentence. It provides, in relevant part:

> "The people shall continue to enjoy and freely exercise all the rights of fishery, and the privileges of the shore, to which they have been heretofore entitled under the charter and usages of this state, * * * and they shall be secure in their rights to the use and enjoyment of the natural resources of the state with due regard for the preservation of their values; and it shall be the duty of the general assembly to provide for the conservation of the air, land, water, plant, animal, mineral and other natural resources of the state, and to adopt all means necessary and proper by law to protect the natural environment of the people of the state by providing adequate resource planning for the control and regulation for the use of the natural resources of the state and for the preservation, regeneration and restoration of the natural environment of the state." R.I. Const. art. 1, sec. 17.

Our canons of constitutional interpretation require that we look at the plain language of section 17, and it is clear to us that the "right of fishery" is qualified by the concomitant language of the 1970 amendment, which imposes a duty on the General Assembly to preserve, regenerate, and conserve through resource planning. This is consistent with this Court's long-standing view that the right of fishery in Rhode Island belongs to the general public, and to no particular individual. See, e.g., Cherenzia, 847 A.2d at 823-24; Opinion to the Senate, 87 R.I. at 38, 137 A.2d at 525-26 (the constitutional guarantee of free fishery is for the benefit of all people and gives no peculiar rights to those resorting to it for commercial purposes); State v. Kofines, 33 R.I. 211, 224, 80 A. 432, 437 (1911); In re Incurring of State Debts, 19 R.I. 610, 613, 37 A. 14, 15 (1896) (defining the term "people," as used in article 1, section 17 of the Rhode Island



PDF created with pdfFactory trial version www.pdffactory.com

Constitution as broad and comprehensive, comprising all the inhabitants of the state); State v. Cozzens, 2 R.I. 561, 563 (1850).

**The Plenary Power of the General Assembly in Fisheries**

This Court has, on a number of occasions, addressed the thorny area that lies between the public's right of fishery and the duty of the General Assembly to preserve these rights. This Court has affirmed and reaffirmed that:

> "Therefore the whole subject of fisheries, floating and shell-fish, and all kinds of shell-fish, whether oysters, clams, quahaugs, mussels, scallops, lobsters, crabs, or fiddlers, or however they may be known and designated and wherever situate within the public domain of the state of Rhode Island, are under the fostering care of the General Assembly. It is for the Legislature to make such laws, regulating and governing the subject of lobster-culture, oyster-culture, clam culture or any other kind of pisciculture, as they may deem expedient. They may regulate the public or private fisheries. They may even prohibit free fishing for a time and for such times as in their judgment it is for the best interest of the state so to do. They may withhold from the public use such natural oyster beds, clam beds, scallop beds or other fish beds as they may deem desirable. They may make a close time within which no person may take shell-fish or other fish, and generally they have complete dominion over fisheries and fish as well as all kinds of game. We find no limitation, in the Constitution, of the power of the General Assembly to legislate in this regard, and they may delegate the administration of their regulations to such officers or boards as they may see fit." Opinion to the Senate, 87 R.I. at 39-40, 137 A.2d at 526 (quoting Payne & Butler, 31 R.I. at 327-28, 77 A. at 158).

Indeed, we have said that the General Assembly's power "is plenary * * * and is no longer open to question." Opinion to the Senate, 87 R.I. at 40, 137 A. at 526 (citing State v. Nelson, 31 R.I. 264, 270, 77 A. 170, 172 (1910) and Windsor v. Coggeshall, 54 R.I. 38, 169 A. 326, 327 (1933)). However, we are mindful that the power granted by the Constitution also is limited textually by the Constitution, and it is to this question we now turn.

**The Public's Right of Fishery**

In 1850, only eight years after ratification of the state constitution (and long before the passage of the Conservation Amendment), this Court declared in Cozzens, 2 R.I. at 563:



PDF created with pdfFactory trial version www.pdffactory.com

> "We are of opinion that the Declaration of Rights and Privileges, contained in the seventeenth section of the first article of the Constitution, was intended to be carried into effect by legislative regulation, such regulation having for its object to secure to the whole people the benefit of the constitutional declaration, and being necessary for that purpose."

In Cozzens, the defendant was indicted for stealing oysters from an oyster bed that the state leased to private parties. Cozzens, 2 R.I. at 563. The defendant argued that the General Assembly's lease to private individuals, but not to him, violated his constitutional right of fishery. Id. at 564. We held "that the General Assembly has power to lease portions of the tide-waters of the State for private oyster fisheries to the complete exclusion, * * * of all but the lessees, even though the leases include portions of natural oyster and quahog grounds, notwithstanding said section 17." Payne & Butler, 31 R.I. at 322, 77 A. at 156 (citing Cozzens, 2 R.I. at 564) (emphases added). This Court reasoned that the object of the General Assembly was "not the benefit of the lessees of the private bed, but * * * to secure to the public a more abundant supply. In other words, the constitutional right is so regulated as to reserve to the public the greatest benefit." Cozzens, 2 R.I. at 564.

We continued to uphold, against constitutional attack, the private leasing of public grounds. See Nelson, 31 R.I. at 264-65, 77 A. at 170. Although the result of these holdings essentially was to exclude all others, save the lessees, from the use and enjoyment of the leased grounds, we have determined that it is within the General Assembly's power to determine that doing so is in the best interest of the whole of the public. Id. In Opinion to the Senate, 87 R.I. at 38-39, 137 A.2d at 526 (quoting Kofines, 33 R.I. at 224, 80 A. at 437 and citing Cozzens, 2 R.I. at 563), we reaffirmed that "fishing must be carried on for the ultimate benefit of the people of the state and not merely for the profit and emolument of the fishermen engaged in the business,"



PDF created with pdfFactory trial version www.pdffactory.com

and that those who fish for commercial purposes have no rights in excess of those granted to the people of the state generally.

Riley argues that this statute only allows for some commercial fishermen to be eligible to take these restricted species, and a statute that "permit[s] one class of citizens to take these fish while prohibiting entirely the taking thereof by another class of citizens * * * [is] invalid as discriminatory." Opinion to the Senate, 87 R.I. at 39, 137 A.2d at 526. Riley further contends that because the scope of the right of fishery is "equal access to the state's fishery resources," any regulation that creates inequality among commercial fishermen must be analyzed with strict scrutiny. See Cherenzia, 847 A.2d at 824 (stating that "[i]f a statute or regulation contained restrictions that infringed upon the fundamental right of the inhabitants of the state to have equal access to the 'rights of fishery,' then such a regulation or law would be subject to strict-scrutiny analysis").

In Cherenzia, 847 A.2d at 819-20, a number of commercial shellfishermen brought a constitutional challenge against fishing regulations prohibiting the use of Self-Contained Underwater Breathing Apparatus (SCUBA) for harvesting shellfish. Id. The fishermen argued that they were a class of citizens who were denied equal access to fishery in violation of their constitutional rights. Id. However, this Court held that "no fundamental constitutional right exists for inhabitants of this state to harvest shellfish from specific bodies of water by using a specific method of fishing." Id. at 824.

Riley argues that, unlike Cherenzia, this is a situation in which a class of individuals, those without licenses, has been denied equal access to fishery, and strict scrutiny should apply. For Riley, the right of "equal access" requires that either everyone is permitted to harvest the same species, or no one is.



PDF created with pdfFactory trial version www.pdffactory.com

Reading "equal access" literally would run counter to our holdings that no fundamental right is implicated when the General Assembly enacts legislation for the "good of the whole," even when it has been at the expense of a few.[11] See, e.g., Cherenzia, 847 A.2d at 825; Nelson, 31 R.I. at 270, 77 A. at 172; Cozzens, 2 R.I. at 563. This Court never has held that a fundamental right of fishery has been implicated and applied strict scrutiny to such regulations. As a result, this Court has applied a rational-basis analysis when testing the constitutionality of fishing regulations and statutes. See Cherenzia, 847 A.2d at 824, 825 (holding that no fundamental right was implicated by statute and applying a rational-basis test). We see no reason to depart from that precedent now.

**Is there a Rational Basis?**

It is well settled that under the equal protection clause, legislative classifications that do not affect a fundamental right or a suspect class such as race, alienage, or national origin, are examined under a "minimal-scrutiny" analysis. Under minimal scrutiny, the Legislature has a wide scope of discretion to enact laws, which will be upheld so long as they bear a reasonable relationship to public health, safety, or welfare. Kaveny, 875 A.2d at 11.

Riley argues that even if we hold that he has no fundamental right to the license he desires, we nonetheless should declare the statute constitutionally infirm. He points out, among other things, that there are various interstate compacts that regulate the poundage of each species of sea creature that can be harvested, and that those regulations are sufficient to preserve the resources for the benefit of all the people of the state, in accordance with the mandate of article 1, section 17 of the Rhode Island Constitution.

[11] The DEM contends that "It isn't to benefit a small select group of people. It provides steady operations in the fishing industry, a steady supply of fish to market, steady employment for these fishermen."



PDF created with pdfFactory trial version www.pdffactory.com

Regulating the fisheries is an immense and complex process. The General Assembly is tasked with a difficult burden as it endeavors (even with the collaboration of numerous parties) to regulate an environment constantly in flux. Viewed through this prism, we must determine whether the means of restricting commercial licenses, undertaken by the General Assembly and DEM, are rationally based to achieve a legitimate goal.[12]

It is significant that the General Assembly has given DEM the authority to issue new licenses on a yearly basis, taking into account the stocks and environmental conditions, and the number of licenses granted or surrendered in a given year. For example, in 2005, thirteen new licenses in restrictive finfish, and also some quahogging licenses, were issued. Riley did not receive one of these licenses because priority went to others, according to regulation, and there were more applicants than available licenses.

It is beyond peradventure that the right of fishery is a public right, and the General Assembly has a constitutional duty to enact legislation necessary to preserve fisheries for the good of the whole. "In these circumstances we are unable to perceive that the rights of any person have been infringed. On the contrary, it seems to us that the greatest good of the greatest number will be advanced by the legislation complained of." Kofines, 33 R.I. at 241, 80 A. at 444.

Although there are boundaries to such legislation, we see nothing discriminatory or invidious in limiting the number of licenses in relation to the condition of the species itself, and then allocating those limited licenses on the basis of who was there first. There is no "class of citizens" that is being discriminated against, and Riley does not argue that he is a member of a

[12] We note that apart from already having a license from the preceding year, other ways to get access to these restricted species include purchasing the business of a fisherman who has the license or transferring the coveted license between family members.



PDF created with pdfFactory trial version www.pdffactory.com

"'discrete and insular minority'" entitling him to such a classification. Kaveny, 875 A.2d at 11 (quoting Trembley v. City of Central Falls, 480 A.2d 1359, 1366 (R.I. 1984)).

Riley is not eligible for the license he seeks, and although he may believe that all those ineligible for this license constitute a class, those who fall into this purported "class" exist only as a consequence of their ineligibility and not because of any particular trait they share. The complex scheme of varying access to restricted species on a yearly basis is "a far cry from the sweeping prohibition aimed at just one 'class of citizens' that the justices opined would be unlawful in Opinion to the Senate." Cherenzia, 847 A.2d at 825.

As noted above, we are mindful that the statute already carries a presumption of constitutionality and it is Riley's burden to show that it is unconstitutional beyond a reasonable doubt. Therefore "[i]f under any reasonable state of known or assumed facts, the challenged provision can be said to protect the public health, safety, or welfare, then the statute must be upheld." Baffoni, 118 R.I. at 233, 373 A.2d at 188 (quoting State ex. rel. Colvin v. Lombardi, 104 R.I. 28, 31, 241 A.2d 625, 627 (1968)). "The legislative power is plenary, and as long as its chosen method bears a rational relationship to the legitimate end to be achieved, neither municipalities nor individuals may challenge the legislative choice solely on the ground that they could devise a better or more accurate method." Newport Court Club Associates v. Town Council of Middletown, 800 A.2d 405, 415 (R.I. 2002) (citing Town of Lincoln v. City of Pawtucket, 745 A.2d 139, 144 (R.I. 2000)).

Section 20-2.1-2 outlines the purposes of the licensing scheme to include:

"(1) Preserve, enhance, and allow for any necessary regeneration of the fisheries of the state, for the benefit of the people of the state, as an ecological asset and as a source of food and recreation;

"(2) Provide Rhode Islanders who wish to fish commercially the opportunity to do so and end the moratorium on issuance of new commercial



PDF created with pdfFactory trial version www.pdffactory.com

fishing licenses so that new licenses may be issued for the year beginning January 1, 2003, and each year thereafter;

"(3) Allow residents who have fished commercially to sell their vessels and gear in a manner that first, facilitates up-grading license levels among residents already in the fishery; that second, provides lateral movement among residents who are holders of commercial fishing licenses to other types of fishing; and that third, enables new entrants into new commercial fishing;

"(4) Respect the interests of residents who fish under licenses issued by the state and wish to continue to fish commercially in a manner that is economically viable: provided, it is specifically not a purpose of this chapter to establish licensing procedures that eliminate the ability to fish commercially of any resident as of the date of enactment who validly holds [a] [sic] commercial fishing license and who meets the application renewal requirements set forth herein;

"* * *

"(6) Establish principles, for a system of adaptive management, * * *;

"(7) Provide a licensure system that facilitates data collection and management so that marine fisheries can be managed more efficiently and effectively."

In our opinion, these goals of conservation and concern for the viability of the fishing industry are legitimate. They also are part of the General Assembly's constitutional duty as the guardian of Rhode Island's natural resources. Riley argues that by considering the effects on the present industry and the economic viability of fishermen who already possess licenses, the General Assembly has overstepped its bounds. We disagree. The Assembly has proper concern for the economic viability of the industry as a whole, and in particular, for those individuals who have the most at stake within it. In Kofines, we said,

"Without protection from the rapacity of man, lobsters must become scarcer, and consequently dearer. This has been the costly experience of all countries where the experiment has been tried. The natural tendency to kill the goose that lays the golden egg is always exhibited when the opportunity is afforded. * * * [M]an should be saved from the consequences of his own selfishness, thoughtlessness, and wastefulness in the matter of fisheries. And for this purpose an ounce of prevention is worth a pound of cure." Kofines, 33 R.I. at 225-26, 80 A. at 438.



PDF created with pdfFactory trial version www.pdffactory.com

The General Assembly regulates fisheries in trust for the public, and it is precisely because "the rapacity of man" remains a legitimate concern to the economic viability of this important industry that there is a need for conservation and preservation for future generations.

Furthermore, limiting access to different species via limited licensing is related directly to the goals of maintaining the viability of those stocks and the fishing trade that depends upon them. This not only benefits the trade, but also it is for the well-being of all the people of the state. It is certainly natural that the most desirable species face the greatest threat from overfishing and depletion. Therefore, we hold that the objectives of this scheme are legitimate and in accordance with the General Assembly's constitutional duty of preserving marine fisheries, and that limiting the entry of new licenses is a rational way to achieve those goals.

We affirm the judgment of the Superior Court and return the papers in this case thereto.

Justice Goldberg did not participate.



PDF created with pdfFactory trial version www.pdffactory.com