**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **RHODE ISLAND FISHERMEN'S ALLIANCE, INC., by and through its President, RICHARD FUKA, STEVEN RILEY, individually, BRIAN LOFTES, individually, STEPHEN MEDERIOS, individually, GREG DUCKWORTH, individually, VINCENT CARVALHO, individually, PETER DIBIASE, ESQ., individually, ROBERT MORRIS, individually, and ANDREW CAVANAGH, individually,** ***Plaintiffs*** | : | |
| **v.** | : | **C.A. NO. 1:07 – cv – 230** |
| **THE DEPARTMENT OF ENVIRONMENTAL MANAGEMENT And W. MICHAEL SULLIVAN, PH.D. In his capacity as the Director of the Rhode Island Department of Environmental Management** ***Defendants*** | : | |

**MEMORANDUM OF LAW IN RESPONSE AND IN OBJECTION TO "DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR DECLARATORY JUDGMENT AND MOTION FOR PRELIMINARY INJUNCTION"**

**AND**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,
Plaintiffs,
By their attorney,

/S/ Robert J. Caron

Robert J. Caron, Esq. 5735
55 Bradford Street, Ste 203
Providence, RI 02903
Phone: (401) 621-8600
Fax (401) 274-2480
rcaron@caronolenlaw.necoxmail.com

**INTRODUCTION**

In Plaintiffs' Motion for Preliminary Injunction, Plaintiffs advised this Court that they were prepared to present testimony in support of their irreparable harm claims. Attached herewith in Appendix II[1] filed with this Response and Objection, are Affidavits from Plaintiffs Brian Loftes App. II, EX. 1; Steven Riley App. II, Ex. 2; Andrew Cavanaugh App. II, Ex. 3; and Vincent Carvalho, App. II, Ex. 4.

Plaintiffs remain prepared to testify as to the harm that they have suffered and will continue to suffer. Additionally, affidavits provided by George Gilbert Pope (App. II, Ex. 5) who was an appointed commissioner to the Atlantic States Marine Fisheries Commission (ASMFC), and Gerald Carvalho (App. II. Ex. 6), who served as proxy for Rhode Island State Representative Eileen Naughton at the ASMFC, provide great insight into what Rhode Island officials knew and when they knew it regarding Rhode Island law's inherent conflict with the recommended regulations for Rhode Island's lobster fishery.

Given the glaring conflict between affidavits submitted by Rhode Island Representatives who were privy to this rule making process, it seems that it would be prudent to conduct an evidentiary hearing. In the alternative, should this Court determine there is no need for further factual evidence to be explored, then it is Plaintiffs who should be granted summary judgment, pursuant to Federal Rule of Civil Procedure 56.

This Memorandum of Law addresses arguments made by the Defendants in opposition to Plaintiffs' prayer for Preliminary Injunction and for Declaratory Judgment

[1] Plaintiffs have previously provided an Appendix to this Court on September 14, 2007 along with their Memorandum of Law in Response to Proposed Intervenor's Supplemental Memorandum to the Court. Some of those documents previously included in that Appendix are referenced again in this New Appendix which contains additional new materials. For the Court's convenience, this New Appendix is entitled "Appendix II" and citations will be to the page of the documents, if any, as p.____, and to the corresponding Appendix page as App. II, ____.

in the first four major headings. It also makes arguments against the Defendants' prayer for Summary Judgment and in Support of Plaintiffs' own Cross- Motion for Summary Judgment in parts five through nine. One of the most pivotal factual questions in this case is whether Rhode Island was mandated to adopt the regulations recommended by Addendum VII to the Lobster Management Plan. Plaintiffs contend that the law, as previously argued and reemphasized in Plaintiffs' accompanying memorandum, shows that it did not, and therefore, the rules adopted by DEM violate Rhode Island Law and Summary Judgment should be granted for Plaintiffs and denied for Defendants.

## I. PLAINTIFFS HAVE SHOWN A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS

In arguing that Plaintiffs have not shown a likelihood of success on the merits, Defendants have first mischaracterized Plaintiffs' position with respect to "rights of fishery."

Plaintiffs have never suggested that the interpretation of R.I. Const. Article 1, Sec. 17, as set out in State v. Kofines, 80 A. 432, 437 (RI 1911) or its progeny, would prevent any conservation measure upon the fisheries, as Defendants aver in their opposition to "Plaintiffs' Motion for Preliminary Injunction and Complaint for Declaratory Judgment." See, "Defendant's Opposition to Plaintiffs' Motion for Declaratory Judgment and Motion for Preliminary Injunction and in Support of Defendant's Motion for Summary Judgment", p. 6 (hereinafter Defendant's Opposition Memo). To the contrary, Plaintiffs invite all regulations which are consistent with conservation, but which regulate all participants in equal measure. It is for this reason that Rhode Island's Supreme Court has stated, in no uncertain terms, that "[i]f a statement or regulation contained restrictions that infringed upon the fundamental rights of the

inhabitants of the State to have equal access to the 'right of fishery', then such a regulation or law would be subject to strict scrutiny analysis." State v. Cherenzia, 847 A.2d 818, 824 (RI 2004).

In Cherenzia, the Court found that a regulation:

> Prohibiting only one method of harvesting shellfish (that is, via SCUBA) from only four specified ponds in the State does not deny these fishermen their livelihood or occupation because ***they all*** may still harvest shellfish - - even with the assistance of SCUBA - - in areas other than the four salt ponds in question. In addition, the fishermen concede that alternative, albeit less efficient, means of harvesting shellfish are still available for them to use at the specified four coastal ponds that are subject to the SCUBA ban. Therefore, the provisions of § 20-6-30 violate no fundamental constitutional "rights of fishery" by prohibiting the harvesting of shellfish just by one particular method in such limited fishing areas.

Id. (emphasis added).

Here, DEM does not seek to regulate one particular method of fishing ***for all*** to abide by in the name of conservation; rather, it has adopted regulations, although not in any way compelled to do so[2], which arbitrarily disenfranchise similarly situated multipurpose license holders from fishing for lobster by way of pot traps. This type of discriminatory regulation simply cannot stand. For as our Supreme Court has also stated in an advisory opinion to Rhode Island's Senate, "[n]either do we understand that the purpose of the question submitted is to inquire whether the legislature may permit one class of citizens to take fish while prohibiting another class of citizens, as for example those who resort to fishing for commercial purposes. Did we so understand the question,

---

[2] Section VI of "Plaintiffs Memorandum of Law in Support of Their Complaint for Declaratory Judgment and Motion for Preliminary Injunction" argues at length that Addenda like Addendum VII are not even enforceable under the ACFCMA. The argument was wholly ignored by the Defendants in their opposition papers. It appears that the Defendants have interpreted the Court's Memorandum and Order regarding jurisdictional issues to present a foregone conclusion that Rhode Island had to adopt these regulations to be in compliance with the "Coastal Fishery Management Plan". This Court pointed out in its Memorandum and Order that "Plaintiffs argue that compliance with addendum VII is optional which Defendant's argue that compliance is mandatory." Memorandum and Order, Chief Justice Lisi, J., November 5, 2007. The Court then stated that it "must look to Rhode Island's and ASMFC rights and obligation pursuant to the Compact and its progeny, The Atlantic Coastal Fisheries Act and any applicable regulations and or procedures" Id. This Court has never ruled that Rhode Island was compelled to adopt the regulations.

we would answer it in the negative, since a statue of such purport would be invalid or discriminating." Opinion to the Senate, 139A.2d 525,526 (RI 1958). In this case we have one class, those who have historically fished for lobster by way of trap; only now some can continue to do so and others cannot. They all have renewed, paid for and expected equal treatment within the realm of the licenses they possessed.

***a. The Rhode Island Supreme Court's Recent Decision in Riley Did Not Deal With Similarly Situated License Holders As Is the Case Here***

In Riley v. Department of Environmental Management, 941A.2d 198 (RI 2008), Mr. Riley sought a principal-effort commercial fishing license which would have allowed him to fish for certain restricted finfish species. The State had essentially imposed a license moratorium on principal effort and multipurpose fishing licenses which allow those licenses to fish for the restricted fish. Because Mr. Riley did not possess one of these licenses as of December 31, 2002, his license application was denied. Id. at p. 203. He was granted a basic commercial fishing license which allowed him to fish for far less lucrative species. Id. Fortuitously, Mr. Riley was awarded a lobster license endorsement by way of lottery, which would of course have allowed him to fish commercially for lobster. However, by the time he was awarded the license, he was unable to invest the necessary resources to fish for lobster for the remaining months of 2003. As a result, he is now disenfranchised from fishing for lobster, although bestowed with the requisite license, due to the fact that he did not fish for lobster during newly adopted retroactive control dates. Riley Affidavit, ¶_2, App. II, 2.

In declining to declare that he had a fundamental right to be granted the specific license he sought, the Court stated that it could not "agree that Riley has a fundamental right to have the specific license he seeks, which would allow him to fish for more valuable species of fish." Id. at 206. Here, Plaintiffs have the same licenses as those who

received allocations. They have paid for and renewed licenses yearly with equal expectaitions.

The Riley decision is a far cry from similar license holders being denied equal access to certain fisheries, based on retroactive control dates and unreliable log books; forms of regulation specifically prohibited by Rhode Island's General Assembly. See e.g. R.I.G.L. §§20 2.1-9(4)(ii); 20-7-9. This is not a situation where the DEM has halted the use of stationary traps for all like license holders in equal measure, or reduced the use thereof across the board in equal measure. Nor it is a situation where all like license holders are restricted from fishing for lobster by way of stationary trap in certain specified areas. Rather, the regulations adopted insulate a few, with the same licenses that Plaintiffs have, to fish by way of stationary traps, based on arbitrary and capricious retroactive control data, data which Rhode Island's General Assembly has declared would not be permitted in any licensing scheme.

***b. Even Though the DEM Has Not Yet Promulgated Regulations Related To Trap Tag Transfers, its Intent is Clear and Therefore Justiciable Under the Preliminary Injunction Standard***

Defendants contend that the Court has no jurisdiction to issue a preliminary injunction regarding the transferability of LTAs because no official regulation has been promulgated to authorize the transfer of LTAs without the transfer of an entire fishing business. Defendants argue that, because no official regulation exists, no actual case or controversy can be deemed to be presented.

However, Defendants do not challenge the fact that space for such a regulation has been reserved at RIMFR Part 15.14.2-11 (titled "Transfers of Area 2 LTAs") and public hearings have been conducted on the issue to transferability. Because the DEM is clearly contemplating the official promulgation of an LTA transferability regulation, a

ripe case or controversy exists and the court has jurisdiction to consider a preliminary injunction regarding LTA transferability. An issue is ripe where "the threat of injury is sufficiently immediate" and where the issue raised "can properly be decided in the abstract." Public Service Co. v. Patch, 167 F.3d 15, 23 (1st Cir. 1998). Here, the threat of injury is sufficiently immediate because the DEM will likely promulgate transferability regulations in the near future and, because transferability regulations have already been proposed and subject to public hearing, the issue of a preliminary injunction on LTA transferability can bee properly decided in the abstract. To allow this type of transferability program would simply create property wealth in a resource meant to be for the public good. People who no longer fish but received allocations due to their performance during the retroactive control dates, would be in the position to profit handsomely. See Vincent Carvalho Affidavit, ¶ 11, App. II, 7.

## II. DEFENDANTS DISREGARD THE PLAIN MEANING OF THE TERM "STATISTICAL PURPOSES" IN THEIR CONCLUSION THAT THE USE OF LOBSTER CATCH REPORTS TO DETERMINE TRAP ALLOCATION DOES NOT VIOLATE R.I.G.L. §20-7-9

R.I.G.L. §20-7-9 provides:

> ***For the purpose of determining whether the number of lobsters caught in the waters of this state are increasing or decreasing during any period***, every person licensed pursuant to § 20-2-24 to catch, take, and/or sell lobsters in Rhode Island shall, upon request of the department of environmental management, report catch and effort statistics upon forms furnished by the department. The returns from any person shall not be made public, shall be kept only in the files of the department, ***and shall be used only for statistical purposes***, (emphasis added).

The last clause of this statute, read without the conjunction "and", reads grammatically that the returns from any person shall be used only for statistical purposes. This does not involve complex legal statutory interpretation; rather, it involves simple principles of English grammar.

Defendants contend that the LTA regulatory scheme does not violate §20-7-9 because the term "statistical purposes" includes using the data contained in lobster catch reports to determine who will receive lobster trap access tags and how many each recipient will be allocated. Defendants' interpretation, however, tortures the plain meaning of "statistical purposes." Statistics are defined as: "facts or data of a numerical kind, assembled, classified, and tabulated so as to present significant information about a given subject. 2. The science of assembly, classifying, tabulating, and analyzing such facts or data." Webster's New World Dictionary, 2nd College Edition.

In the absence of ambiguity, Rhode Island courts must give the words of the statute their plain and literal meaning. State v. Oliveira, 432 A.2d 664, 666 (R.I. 1981). The plain meaning of "statistical purposes," and the meaning likely contemplated when the regulation was enacted, is use of the lobster catch report data for tracking species to determine whether future conservation measures must be enacted to protect those species. The authors of the regulation certainly did not contemplate using the catch reports to punish fishermen who honestly reported low catch numbers or none based upon redirected fishing effort into more abundant fisheries during the chosen control periods. Had they meant it to have such use, they could have so stated.

Defendants emphasize that the lobster trap allocation scheme does not make the lobster catch reports public. However, the provision that prohibits making the reports public and the provision that prohibits using them for anything other than statistical purposes are separated by the word "and". "**Statutory** phrases separated by the word "and" are usually to be interpreted in the **conjunctive**." Long Mai v. Nolan, 2005 R.I. Super. LEXIS 2, *16 (2005) See also Earle v. Zoning Bd. of Review, 96 R.I. 321, 324 (1963) (interpreting "and" as a conjunctive in zoning ordinance); U.S. v. Pion, 25 F.3d

18, 20 (1st Cir. 1994) (interpreting "and" as a conjunctive in Federal Sentencing Guidelines). The word "and" indicates that making the reports public ***and*** using them for something other than statistical purposes, are two different actions and, therefore, it is possible to violate the statute without making the reports public. Furthermore, Plaintiffs submit that by directly correlating the catch report data with the trap allocations, the regulatory scheme does in fact make the log reports public. In other words, those who received an allocation based on their fishing performance for the retroactive control dates, now have allocations which are public record. Everyone now is able to learn exactly who landed lobster during the retroactive control period and how much of it they landed based on the allocation they received. As a result, the statute is violated twice.

Defendants also emphasize that use of the catch report data is an "appropriate means for the States to come into compliance with Addendum VII's ***requirement*** that States subject to the ASMFC's effort control plan utilize reliable data in the calculation of lobster trap allocations". See Opposition Memo, p. 18 (emphasis added). However, Defendants do not acknowledge that the State need not implement a lobster trap allocation scheme using retroactive control dates to comply with Addendum VII or with Amendment, which is the "Plan". This point is argued further in Plaintiffs' Opposition to Defendants' Summary Judgment Motion, *infra*, at major heading VI at page 13 herein.

## III. DEFENDANTS ERRONEOUSLY ARGUE THAT THE STATE WAS REQUIRED BY FEDERAL LAW TO ADOPT THE ASMFC'S LOBSTER TRAP ALLOCATION SCHEME AND, THEREFORE, USE OF RETROACTIVE CONTROL DATES WAS PERMISSIBLE

In 2002 the Rhode Island Legislation passed an enabling statute outlining the powers and duties of the Director of DEM in adopting a commercial fisheries licensing schemes. Pursuant to the enabling statute, the Director was to:

> ***Establish prospective control dates*** that provide notice to the public that access to, and levels of participation in, a fishery may be restricted and

> that entrance into, or increases in levels of participation in a fishery after the control date may not be treated in the same way as participation in the fishery prior to the control date; ***retroactive control dates are prohibited and shall not be used or implemented***, unless expressly required by federal law, regulation or court decision…

R.I.G.L. § 20-2.1-9(4)(ii) (emphasis added).

That language is very clear and unambiguous. Defendants do not dispute that the control dates utilized in the lobster trap allocation scheme are retroactive. Instead, they argue that the use of retroactive control dates are permissible because the State was required by federal law to adopt the ASMFC's trap allocation scheme. The Defendants' position is incorrect. The State had the option of adopting an alternative conservation plan that does not violate Rhode Island's Constitution and §20-2.1-9(4)(ii), in lieu of adopting Addendum VII's recommendations. This argument was discussed at length in Plaintiffs' Memorandum of Law in Support of Complaint for Declaratory Judgment and Motion for Preliminary Injunction and Defendants did not address it in their response. Plaintiffs have repeatedly emphasized that the regulations adopted by DEM were not mandatory. Indeed, conservation alternatives were suggested and submitted to the Director of DEM, Defendant Sullivan. See Commissioner Gil Pope Affidavit, ¶ 8; Carvalho Affidavit, ¶¶ 4,5 and Attachment 1 to the Carvalho Affidavit. See Argument, *infra*, at major heading VII at page 15 herein.

## IV. EVEN IF THIS COURT DOES NOT APPLY STRICT SCRUTINY, THE REGULATIONS ADOPTED ARE NOT EVEN RATIONALLY RELATED TO A LEGITIMATE GOVERNMENT PURPOSE

Though Defendants' contend the DEM has complied with Rhode Island's Administrative Procedures Act (hereinafter "APA), the arbitrary and capricious retroactive control dates that determine lobster trap allocation violate due process and equal protection. The Equal Protection Clause of the United States Constitution

guarantees that similarly situated classes will not be treated differently on an arbitrary basis. Reed v. Reed, 404 U.S. 71, 76 (1971). A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." Id. For example, in Massey the court struck down a statute that required a person to be a resident of Maine for three years prior to qualifying for a lobster license. Massey v. Apollonio, 387 F.Supp. 373, 375 (D.Me. 1974). The state contended that the purpose of the statute was to protect the resource by limiting those summer residents who would engage in lobstering. Id. The court held the statute was not tailored enough to meet the rational basis test because it would prevent some year-round residents from fishing and "precludes any person who has not resided in Maine for three years from demonstrating that he is more than a summer resident or that he is a serious commercial fisherman." Id. at 376.

Similarly, the retroactive control dates chosen to determine the allocation of lobster traps, the period from 2001 to 2003, are arbitrary and capricious and bear no rational relationship to DEM's interest in protecting the Area 2 lobster population. Defendants have offered no scientific evidence whatsoever that their conservation goals are related to the chosen control dates, 2001-2003. Therefore, the LTA regulatory scheme passes neither strict scrutiny nor rational basis analysis and should be declared unconstitutional.

Furthermore, Rhode Island's Constitution requires that the "burden of the state ought to be fairly distributed among its citizens" and that no "person shall be denied equal protection of the laws." R.I. Const. Art. I, § 2. The standard for determining whether such legislation violates this provision, which is essentially a guarantee of equal

protection of the laws, is whether the challenged statute is a capricious exercise of lawmaking power. Warwick v. Almac's, 442 A.2d 1265, 1270 (R.I. 1982). For example, in Warwick the Rhode Island Supreme Court upheld a Sunday-closing law with an exemption for small businesses because the statute's distinction between large and small retailers had a rational basis and was not arbitrary and capricious. Id. at 1267. The court reasoned that:

> the legislature could reasonably find that by limiting the size of stores that may open on Sunday, commercial activity is minimized and the number of citizens enjoying a day of rest is maximized, while products or services necessary or desirable for the enjoyment of the day are still available.

Id. at 1271.

Unlike the Sunday-closing law at issue in Warwick, where the distinction between large and small retailers was rationally related to the statutory purpose, the retroactive control dates that determine the allocation of lobster traps under the LTA regulatory scheme are not in any way related to the goal of protecting the lobster population. Therefore, the control dates are a capricious exercise of power and violate Article I § 2 of the Rhode Island Constitution. The court should declare the LTA regulatory scheme unconstitutional and enjoin the DEM from implementing it.

## PLAINTIFFS' RESPONSE TO AND OPPOSTION TO DEFENDANTS' SUMMARY JUDGMENT MOTION

***a. Summary Judgment Standard***

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Buchanan v. Maine, 469 F.3d 158 (1st Cir. 2006), quoting

Fed. R. Civ. P. 56(c). "Rule 56(c) provides that the trial judge shall then grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 277 U.S. 242, 250 (1986). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id.

The standard for summary judgment "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." Id. citing Brady v. Southern R. Co., 320 U.S. 476, 479-480 (1943). "If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." Id. at 250-51 citing Wilkerson v. McCarthy, 336 U.S. 53, 62 (1949).

## V. THERE ARE GENUINE MATERIAL FACTUAL ISSUES MIXED WITH QUESTIONS OF LAW IN THIS CASE AND SUMMARY JUDGMENT IS INAPPROPRIATE AND UNWARRANTED

### *a. The Most Glaring Factual Issue To Be Determined is Whether Rhode Island Was Compelled or Required to Adopt the Challenged Regulations*

Plaintiffs submit that Summary Judgment is inappropriate for the Defendants as the proposed undisputed facts submitted by the Defendants are in conflict with Plaintiffs' position and those affidavits submitted by Plaintiffs herewith in response. However, should the Court determine that there are no genuine issues of material fact to be decided, Summary Judgment should be entered in favor of Plaintiffs. Plaintiffs base this on the facts as alleged in these pleadings with supporting documents, and the law as argued. Simply put, should this Court determine, as Plaintiffs argue it should, that the regulations

adopted by the State were not mandatory, then it should be clear that their adoption violates Rhode Island Law.

The Defendants' repeatedly attempt to assure this Court that Rhode Island was required to adopt the challenged regulations at every opportunity, and that therefore, Rhode Island Law can be ignored. See e.g., "Defendants' Memorandum of Law in Support of Defendants' Opposition to Plaintiffs' Motion for Declaratory Judgment and Motion for Preliminary Injunction and in Support of Defendants' Motion for Summary Judgment" at 18, where the Defendants, confronted head on with Rhode Island law which specifically prohibits the use of retroactive control dates, state that "Plaintiffs position turns a blind eye to the fact that the retroactive control dates of 2001- 2003 were established by RIMFR Part 15.14.2 in order for the State to come into compliance with Addendum VII to Amendment 3. . ."

In fact, It is the Defendants who turn a "blind eye" to the plain language of R.I.G.L. § 20-2.1-9(4)(ii), and the fact that Rhode Island was not "required" to adopt the regulations. This determination raises a significant genuine material factual issue to be determined by this Court, i.e., whether Rhode Island was mandated or not to adopt the regulation.

## VI. AMENDMENT 3 TO THE INTERSTATE FISHERY MANAGEMENT PLAN FOR AMERICAN LOBSTER AND ADDENDUM VII DO NOT REQUIRE THE STATE OF RHODE ISLAND TO ADOPT THE SPECIFIC REGULATIONS WHICH DEM CHOSE TO ADOPT WITH RESPECT TO LOBSTER TRAP TAG ALLOCATIONS

Amendment 3 to the Interstate Fishery Management Plan for American Lobster supersedes all prior versions of the Lobster Plan and amendments, and thus is the current operative Plan. See, p. ii, App. II, 27. ("Amendment #3 completely replaces all previous fishery management plans and amendments for the Atlantic States Marine Fisheries

Commission."). The Plan's Executive Summary states in no uncertain terms under the heading "Measures Applicable to All States and Areas Along the Atlantic Coast", that "***Nothing in this section precludes any state or area from promulgating different regulations as long as it can be shown to the Board's satisfaction that alternate regulations provide for equivalent conservation of the lobster resource (see Section 3.6).***" Id. App. II, 28 (emphasis added). Moreover, the Plan "allows **states** and the Lobster Management Board the flexibility to change certain measures of the plan to account for changing fishery conditions, and to allow for innovation and new management measures." Id., App. II, 29(emphasis added).

As a part of the "flexibility" granted to states, the Plan provides for "conservation equivalency." Id. App. II, 53. Under the heading "Alternative State Management Regimes", the "Plan" provides as follows:

> 3.5.1 Procedures
>
> A state may submit a proposal for a change to its regulatory program or any mandatory compliance measure under this amendment to the commission, including a proposal for *De Minimus*[3] status. Such changes shall be submitted to the Chair of the Plan review team…The Board will decide whether to approve the state proposal for an alternative management program if it determines that it is consistent with the target fishing mortality rate then applicable, and the goals and objections of this amendment.
>
> 3.5.2 Management Program Equivalency
>
> The Lobster Technical Committee will review any alternative state proposals under this section and provide to the Board its evaluation of the adequacy of such proposals.

Id. App. II, 57.

[3] *De Minimus* status is defined as a "situation in which, under existing conditions of the stock and scope of the fishery, conservation and enforcement actions taken by an individual state would be expected to contribute insignificantly to a coastwide conservation program required by an FMP or amendment." Charter, § Eight (k), App. II, 92.

The existence of this provision, providing as it does the right of states to submit alternative management schemes, undeniably eviscerates any argument that Rhode Island had no choice but to adopt Addendum VII.

## VII. CONSERVATION EQUIVALENCY WAS AN OPTION FOR RHODE ISLAND AND OTHER STATES HAVE UTILIZED THE OPTION

For example, on or about August 14, 2007, the Atlantic States Marine Fisheries Commission's American Lobster Management Board (Board), approved a conservation equivalency measure for Connecticut and New York for Lobster Management Area 6. See App. II, 96, Atlantic States Marine Fisheries Commission News Release, August 14, 2007. The alternative plan accepted by the Board and the Commission adopted a v-notch based restoration measure in place of the 1/16" minimum length increase for legal sized lobster as adopted by Addendum XI p. 4, App. II, 100.

The Court needs to appreciate that New York and Connecticut resident fishermen fish generally in Area 6 which includes most of their state waters. It is for this reason, that it is readily apparent why New York and Connecticut voted for Addendum VII's Lobster Trap Allocation recommendations. It simply does not affect their citizen fishermen in any appreciable way. A look at the map of the American Management Areas established for the purpose of regional lobster management which follows this paragraph is illustrative.

*American lobster Management Areas established for the purpose of regional lobster management.*




NOAA Fisheries
Northeast Regional Office
Gloucester, MA

Area 2 includes ***all*** of Rhode Island's State waters. The American lobster is a migrating species and it moves freely between Area 6 and Area 2. Gerald Carvalho Affidavit, ¶ 8, App. II, 17. As stated in the Affidavit of Toni Kerns submitted by Defendants, at Paragraph 20, "***New York and Connecticut have only a handful of fishermen requesting an allocation[within Area 2]***" (emphasis added). That is because only a smallest of portions of New York and Connecticut waters are included in Area 2. The vast majority of New York and Connecticut fishermen fish in Area 6.

It certainly behooved those states to vote for Addendum VII, as ***any*** regulatory restrictions imposed in Area 2 would only benefit their State's inhabitants to fish for the same resource migrating to Area 6. For Area 6 (new York and Connecticut) the ASMFC recommended regulations pursuant to the Lobster Management Plan (that would have been an increase in gauge size i.e. prohibiting the taking of smaller lobsters.) The v-notch lobster program was substituted for the scheduled gauge increase. "Charter" See *infra*, App. II, 92. Likewise, New Jersey Fishermens' dalliance into Area 2 is so *de minimus*, that apparently the federal government will be determining the Area 2 allocations for seven (7) New Jersey residents seeking allocations. Kerns Affidavit, ¶ 20. All of this flies in the face of Defendants' arguments that there is a need for uniformity among the managed areas. It is not about uniformity, it is about the unequal treatments of those who were granted allocations under an unlawful, yet convenient regulatory scheme, despite strong and well considered objection from Rhode Island's own appointed representatives. As then Commissioner Pope has stated in his Affidavit at ¶ 16, App. II, 13:

> I highly recommend that everyone involved in these proceedings avail themselves to reading Addendum VII itself to get a better idea as to precisely why there are many fishermen that strongly object to why both the State of Rhode Island and the ASMFC did not availed (sic) themselves of the other alternatives to Addendum VII. The adoption and acceptance

> of Addendum VII has unfortunately and artificially created economic winners and losers.

This result cannot stand consistent with Rhode Island's peculiar Constitutional Provision at Article 1, Sec. 17 and the Rhode Island Supreme Court's interpretation of the same, as articulated in Cherenzia, *supra*.

The ASMFC makes much of the chosen control year for trap allocations in Addendum VII. It chooses to characterize this control date as a "pivotal requirement". See "Supplemental Memorandum of the Atlantic States Marine Fisheries Commission," p.1. The fact of the matter is that the recommended control date was neither mandatory nor pivotal. It is an issue of economics and allocation rather than one of conservation. The key conservation issue is the amount of lobster landed, the gauge size for those landed, and other equal access regulations. See Pope Affidavit, ¶ 6, App. II 10.

Yet another example of conservation equivalency illustrates the point. Massachusetts was to provide for lobster trap allotments for the Outer Cape Lobster Management Area (OCLMA) pursuant to Addendum III. The Addendum provided for each lobster fisher's allotment for the year 2002 to be based upon the year 2000 catch report statistics. See Addendum III, p.8, App. II, 111. In a press release dated December 17, 2003, it was announced that the ASMFC Lobster Board approved a Massachusetts conservation equivalency proposal for the OCLMA. Instead of allocating traps as provided in Addendum III, Massachusetts preferred and was able to use the years 1999 through 2001 as the qualifying years to identify potential participants. Moreover, Massachusetts was able to allocate traps based on ***"fishing performed during 2000-2003, with pounds as the qualifying parameter."*** See American Lobster Management Board Press Release, December 17, 2003, App. II, 114 (emphasis added). In this example of conservation equivalency, not only were the qualifying years apparently not pivotal, the

trap allocations were ultimately based on pounds landed as opposed to proof of documentation of the number of traps fished in 2001 as provided in Addendum III.[4]

## VIII. THE ASMFC'S CHARTER, AND AMENDMENT 3 (THE PLAN), PROVIDE AMPLE PROOF THAT RHODE ISLAND COULD HAVE PROFFERED CONSERVATION EQUIVALENCY THAT WOULD NOT HAVE OFFENDED STATE LAW

Under the heading "Standards and Procedures for Interstate Fishery Management Plans", the Charter states:

> The Atlantic States Marine Fisheries Commission recognizes that an effective fishing management program must be carefully designed in order to fully reflect the varying values and other considerations that are important to the various interest groups involved in coastal fisheries. Social and economic impacts and benefits must be taken into account. Management measures should focus on conservation ***while allowing states to make allocation decisions***.

Charter, p. 14, App. II, 82 (emphasis added).

The Charter also provides that if a "fishery management plan so provides, procedures under which the State may implement and enforce alternative management ***measures to achieve conservation equivalency***" may be enacted. Id. p.16, App. II, 84 (emphasis added). Therefore, the Charter itself contemplates the use of alternative conservation measures.

Thus, the analysis here is whether an Interstate Fisheries Management Plan adopted by the ASMFC, here Amendment 3, allows for individual states to implement and enforce alternative measures to achieve conservation equivalency.

As shown above, the Plan, or Amendment 3, does make provisions for a state, here Rhode Island, to implement and enforce alternative measures to achieve conservation equivalency. Under the Plan's "Executive Summary," "[n]othing in this

---

[4] See E-mail response from Toni Kerns, Senior FMP Coordinator for the Commission, to an inquiry from a newspaper reporter's question about Rhode Island's need to adopt the regulations it did, in which she acknowledged that Rhode Island could have submitted its own proposal for change to its regulatory program or mandatory compliance measure. See Exhibit 9, App. II. 116.

section precludes any state or area from promulgating different regulations as long as it can be shown to the Board's satisfaction that alternate regulations provide for equivalent conservation of the lobster resource." Amendment 3, p iii, App. II, 28. The "Plan" further states that "Amendment 3, as well as most Commission plans, allows states and the Lobster Management Board the flexibility to change certain measures of the plan to account for changing fishery conditions and to allow for innovation and new management measures." Id. p. iv, App. II,29

The procedures for state conservation equivalency measures can be found in the "Plan" at section 3.5.1, wherein, it states that, "[a] state may submit a proposal for a change to its regulatory programs ***or any mandatory compliance measure under this amendment*** to the Commission, including a proposal for *De Minimus* status." Id., p. 24, App. II, 56 (emphasis added).

The "Plan" itself acknowledges that "[a]lthough the Atlantic States Marine Fisheries Commission ***does not have authority to directly compel state implementation of these measures***, it will continually monitor the effectiveness of state implementation and determine whether states are in compliance with the provisions of this fishery management plan." Id., p. 27, App. II, 59 (emphasis added). The Plan further provides that "[s]tates are expected to implement these measures ***faithfully under state laws***." Id. (emphasis added). Adopting regulations which clearly violate state law, as DEM has done, is not in keeping with faithful implementation under state law.

## IX. STATE REPRESENTATIVES DID IN FACT ARGUE THAT THE PROPOSED REGULATIONS WERE CONTRARY TO RHODE ISLAND LAW AND PROPOSALS FOR CONSERVATION EQUIVALENCY WERE MADE

Gil Pope was a commissioner to the ASMFC appointed by the Governor of Rhode Island. He did not vote for Addendum VII. Rhode Island Commissioner Mark Gibson and New York Commissioner Gordon Colvin voted for the measure, despite the state's legislative representative's strongly worded concerns about how it would affect Rhode Island law.

In December of 2003, Gerald Carvalho, as then proxy for Rhode Island Representative Eileen Naughton to the ASMFC, voiced numerous concerns about the transferability provisions and Lobster Trap Tag Allocations and private rights of access to the American Lobster Management Board. Specifically, Mr. Carvalho stated:

> Mr. Carvalho: In response to Gordon's comments, ***there is a clear difference between establishing a minimum size closed seasons, and that sort of regulation. But when we established a regulation that in effect creates property, it runs in conflict with the general assembly or the state's prerogative. It even runs in conflict with our constitution. There are constitutional questions.*** There is a clear difference between establishing a property right or telling a state how many participants can participate in State waters.
>
> If we do this in the commercial end, what's to say that we don't take an action in another fishery and dictate how many commercial fishermen can participate or how many recreational fishermen can participate? I think we are running into a problem here involving state's rights, and it's not just a biological limit or biological conservation measure.

Proceedings of the Atlantic States Marine Fisheries Commission American lobster Management Board, December, 2003, p. 60, App II 119(emphasis added).

Moreover, Mr. Carvalho made clear in a letter and memorandum to John I. Nelson Jr., Chairman of the ASMFC, that the proposed regulation conflicted with Rhode Island law. Gerald M. Carvalho letter to Chairman Nelson, February 25, 2008, App. II 121. Specifically, Mr. Carvalho argued that limiting the number of traps fished in area 2 would have no rational basis to conservation. Id. App. II, 122-123.

As he noted, "[t]here appears to be no scientific or rational basis for the adoption of the aforementioned rules other than to limit the number of participants in the commercial fishery to a select group and grant to those qualified individuals a transferable property right of access." Id, p. 3, App. II, 123.

He also argued that transferable trap tags would violate Rhode Island's Constitution, Article 1, Sec. 17. Id. Further, Mr. Carvalho concluded as follows:

> ***RI's Constitutional mandate in considering plans for the conservation of any marine resources dictates that any action taken must [be] in the best interest of all the people of the State of Rhode Island***.[5] The State's interest reaches beyond a simple biological or single user group approach. Plans must not conflict with applicable state constitutional provisions, must minimize or eliminate the adverse economic impact on small business and must provide equitable access for all its residents to the marine resources.
>
> The recently adopted addendum has little if any scientifically proven conservation benefit associated with the private right of access, limited entry, and trap reduction plan. Further, the plan specifically and offensively creates an oligarchy of exclusive participants whereby the resource is concentrated in the hands of a favored group.

Id. p. 4, App. II, 124. (emphasis added)

Finally, some six months before the Director adopted the regulations, Mr. Carvalho and Commissioner Pope prepared and presented him with a document which included "Critical Questions" of Rhode Island Law being in conflict with Addendum VII. Carvalho affidavit, Paragraph 5, App. II, 15. Those critical questions, observations and objections raised are attached and incorporated with Mr. Carvalho's affidavit as "Attachment 1". App. II, 19. He and Mr. Pope raised the log book issue, optional

[5] This comment illustrates plainly that Plaintiffs have not ever, as Defendants have stated, proposed that no conservation measure could be imposed upon fishermen in Rhode Island "including size restrictions, possession limits, or the taking of certain endangered or threatened species." Defendants' Opposition Memo, p. 6. Nor have plaintiffs ever suggested or claimed "unrestrained access" to the commercial fishery of Rhode Island. Id., p. 11. Neither have any of the Plaintiffs at any time claimed a "fundamental right to commercially exploit public fishery resources, [or] to fish in a manner that maximizes their personal economic gain. . ." Id., p.12. What the Plaintiffs have argued is that regulation should apply in equal measure to all participants. Our Supreme Court has said that permitting "one class of citizens to take fish while prohibiting another class of citizens" would be invalid or discriminatory. Opinion to the Senate, 139 A.2d 525, 526 (RI 1958).

elements, and the considered transfer of traps as creating property interests being repugnant to Rhode Island Law. Id.

These were appointed state representatives who gave great voice, thought, and ultimately objection to these proposed regulations. They were not self-interested participants in the Rhode Island lobster fishery.

To now suggest that Rhode Island and its representatives did not voice objection or alternatives, as Mr. Gibson's affidavit would have this Court believe, is nothing short of revisionist history.

**a. *Mr. Gibson's Doomsday Scenarios Suggested in His Affidavit Are Without Merit in Light of the Hard Data***

The alarmist calculations of Mark Gibson regarding potential trap allocations if the Injunction or ultimately the Complaint for Declaratory Judgment is granted, make no sense in light of historic lobster landings and data. Not every commercially licensed fisherman is equipped for or fishes for lobster using pot traps. For example, in 1999, under a trap allocation limit for all those licensed who sought traps, 67, 383 traps were reported have been fished. See 1999-2000 Rhode Island Lobster Trap Effort Data, App. II, 125-126. That involved 316 Rhode Island State-Only licensed fishermen who chose to fish for lobster by way of pot out of the 1,163 licensees. Id. Likewise, in 2000/2001, 307 out of 1,167 license fishermen fished by way of trap fishing, a total of 55,007 traps. Id. This is far less than the 129,314 lobster traps presently allocated under these adopted regulations for the privileged few. See Gibson Affidavit, ¶ 8, App. II, 10.

Thus, the potential stampede on allocations that Mr. Gibson foreshadows is completely unrealistic when compared to the real data. One alternative conservation equivalency measure could have been 100 traps for each 1,167 fishermen licensed, making a total of 116,700 traps to be fished. This of course would be equal access

regulation to all those similarly licensed, and still result in less trap allocations than have presently been allotted to a privileged few.

Indeed, Mr. Gibson has made his opinion and skepticism known regarding trap reductions and relative conservation benefits. Back in 1999, when the American Lobster Management Board was discussing Amendment 3's proposed default trap schedule which would have reduced the number of traps that licensed fishermen could fish in New Hampshire, Mr. Gibson stated as follows:

> Mr. Gibson: Well, the tabled motion implies to me that there is a conservation benefit associated with Amendment 3's default trap schedule. I'm not aware of any information in Amendment 3 or that has been developed by the Technical Committee that shows that there is a conservation benefit associated with that trap schedule.
> That is a reduction in fishing mortality. ***I'm not aware of any information anywhere, worldwide with crustacean fisheries anywhere, that the trap limits, once imposed, will reduce fishing mortality once the fishery is exhibiting a saturation effect.***
> So, there seems to be no conservation benefit associated with default measures. Therefore, the point of whether it's ***conservation equivalent*** is a moot point. I'm going to vote for it ***simply because it gives New Hampshire flexibility in managing their fishery.***

American Lobster Management Board meeting, January 12-13, 1999, p. 45-46, App. II, 128-129. (emphasis added)

The point of this statement serves two purposes. First, it is noteworthy that Mr. Gibson embraced the notion of a member State having flexibility in managing their own fishery. Next, it once again shows a member state receiving conservation equivalency, and it very much calls into question any conservation benefit to this lobster trap allocation scheme for Area 2.

Indeed, following an unexplained die-off of lobster in Long Island Sound in 1999, Congress earmarked millions in grants to seventeen scientists to investigate the causes for the die-off. Habitat Hotline Atlantic, April, 2005, Volume XII, Number 1, p. 2, App.

II, 134. The research identified four (4) possible factors contributing to the die-off: "changes in water quality conditions including elevated temperatures and changes in dissolved oxygen levels; changes in environmental conditions such as pesticide levels or changes from storms; lobster crowding; and diseases." Id.

Nowhere in this extensive study was "over fishing" or increased fishery effort or any effort or pot allocations on the fishery suggested to be a cause for the depletion in stock.

## CONCLUSION

Given Rhode Island law and the choices which were available to the State, alternative conservation measures should have been adopted. The regulations chosen were recommendations made by the ASMFC, not mandatory measures. The net result of the adopted regulation provides for more trap allocations than were actually fished during the chosen retroactive control dates. In turn, many Rhode Island fishermen already licensed to fish for these species, have now been forever disenfranchised from their livelihood based on arbitrary and capricious rule making. All of this under the guise of we had to do it, which as argued by the Plaintiffs, was not the case.

This Court should enjoin the State from continuing to enforce these regulations and declare that they indeed violate Rhode Island law. If Summary Judgment is to be granted, it should be granted in favor of Plaintiffs. In the alternative, this Court should conduct an evidentiary hearing so that state actors in this and Plaintiffs may be heard and examined about why these regulations were adopted, and whether there is any science to support them as a conservation measure. Regulations with such far reaching implications on the livelihood of so many should not be sustained based on what has been presented.

## CERTIFICATION

I hereby certify that this document has been filed electronically on the 10th day of April, 2008, and is available for viewing and downloading from the ECF system.

/S/ Robert J. Caron
Robert J. Caron, Esq. 5735
55 Bradford Street, Ste 203
Providence, RI 02903
Phone: (401) 621-8600
Fax (401) 274-2480
rcaron@caronolenlaw.necoxmail.com