UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RHODE ISLAND FISHERMEN'S ALLIANCE,
INC., by and through its President, RICHARD FUKA,
STEVEN RILEY, individually, BRIAN LOFTES,
individually, STEPHEN MEDERIOS, individually,
GREG DUCKWORTH, individually, VINCENT
CARVALHO, individually, PETER DIBIASE, ESQ.,
individually, ROBERT MORRIS, individually, and
ANDREW CAVANAGH, individually,
          Plaintiffs,

        v.                                           C.A. No. 07-230ML

THE DEPARTMENT OF ENVIRONMENTAL
MANAGEMENT and W. MICHAEL SULLIVAN,
PH.D. in his capacity as the Director of the Rhode
Island Department of Environment Management,
          Defendants,

        and

ATLANTIC STATES MARINE FISHERIES
COMMISSION,
          Intervenor/Defendant,

        and

RHODE ISLAND LOBSTERMEN'S ASSOCIATION,
LANNY DELLINGER, MICHAEL MARCHETTI,
AL CHRISTOPHER, RUSS WALLACE, AARON GERWITZ,
AL EAGLES, and HARRY TOWNE

          Intervenors/Defendants.

## **MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiffs', Rhode Island Fishermen's Alliance, Inc.,

1

and several individual plaintiff's ("Plaintiffs"), motion for declaratory judgment and preliminary

injunction, and Plaintiffs' and Defendants', Department of Environmental Management and W.

Michael Sullivan ("DEM"), cross motions for summary judgment.

Background

Plaintiffs originally filed suit against DEM in Rhode Island Superior Court.  DEM

removed the action to this Court claiming federal question jurisdiction.  Plaintiffs filed a motion

to remand which this Court denied.  See Rhode Island Fishermen's Alliance v. The Department

of Environmental Management, C.A. No. 07-230ML (D.R.I. Nov. 5, 2007).  Plaintiffs now seek

an order from this Court barring the implementation and enforcement of certain DEM

regulations, specifically Rhode Island Marine Fisheries Regulations 15.14.2-6, 6.-7-8(a) and

15.14.2-11.  The challenged regulations limit lobster fishing in state waters.  Plaintiffs allege that

DEM's regulatory scheme violates the Rhode Island Constitution and several state statutes and

that the actions of the Director of DEM are beyond the scope of his legislative grant of authority.

DEM counters that the regulations do not offend the Rhode Island Constitution nor violate state

statutory law and that the Director of DEM has not acted beyond the scope of his authority.  It is

DEM's position that Rhode Island was obligated to implement the regulations because Rhode

Island is a member of the Atlantic States Marine Fisheries Compact.

Standard of Review –  Summary Judgment

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is

"genuine" if the pertinent evidence is such that a rational factfinder could resolve the issue in

2

favor of either party, and a fact is "material" if it "has the capacity to sway the outcome of the litigation under the applicable law." National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1ˢᵗ Cir. 1995).

The moving party bears the burden of showing the Court that no genuine issue of material fact exists. Id. Once the movant has made the requisite showing, the nonmoving party "may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The Court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. Continental Casualty Co. v. Canadian Universal Insurance Co., 924 F.2d 370 (1ˢᵗ Cir. 1991). The legal standard for summary judgment is not changed when parties file cross motions for summary judgment. Adria International Group, Inc. v. Ferre Development, Inc., 241 F.3d 103 (1st Cir. 2001). "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." Bienkowski v. Northeastern University, 285 F.3d 138, 140 (1st Cir. 2002) (internal quotation marks and citation omitted).

### Statutory and Regulatory Framework

Because it is DEM's position that Rhode Island was obligated to implement the regulations as a signatory to the Atlantic States Marine Fisheries Compact, ("Compact") the Court begins with a brief history of the Compact. The Compact is an interstate agreement consented to and approved by Congress in 1942. Pub. L. 77-539, 56 Stat. 267; see 16 U.S.C. § 5102(3); see also Medeiros v. Atlantic States Marine Fisheries Commission, 327 F. Supp. 2d 145 (D.R.I. 2004), aff'd sub nom. Medeiros v. Vincent, 431 F.3d 25 (1st Cir. 2005), cert. denied sub

3

nom. Medeiros v. Sullivan, 126 S. Ct. 2968 (2006). Fifteen states and the District of Columbia entered into the Compact and agreed that the they would "exercise joint regulatory oversight of their fisheries . . . primarily through the development of interstate fisheries management plans" ("IFMPs"). Medeiros, 431 F.3d at 27. The Compact was intended to "promote the better utilization of the fisheries, marine, shell and anadromous of the Atlantic seaboard by the development of a joint program for the promotion and protection of such fisheries and by the prevention of the physical waste of the fisheries from any cause." Medeiros, 327 F. Supp. 2d at 147 (internal quotation marks and citation omitted). The Compact created the Atlantic States Marine Fisheries Commission ("ASMFC"). The duty of ASMFC is to "make inquiry and ascertain . . . such methods, practices, circumstances and conditions as may be disclosed for bringing about the conservation of, the prevention of[,] the depletion and physical waste of the fisheries, marine, shell and anadromous of the Atlantic seaboard." Compact Article IV.

Rhode Island state law authorizes and directs all officers of the state of Rhode Island "to do all things falling within their respective provinces and jurisdiction necessary or incidental to the carrying out of the [C]ompact in every particular; it being hereby declared to be the policy of the state of Rhode Island to perform and carry out the [C]ompact and to accomplish its purposes." R.I. Gen. Laws § 20-8-7. The Compact is binding upon each signatory state until "renounced by it." Compact Article XII.

Until 1993, the decision to participate in an IFMP was voluntary. Medeiros, 431 F.3d at 27; see also Toomer v. Witsell, 334 U.S. 385, 388 n.5 (1948) (noting that, at the time, ASMFC's duties were "largely consultive and advisory"). In 1993, however, Congress enacted the Atlantic Coastal Fisheries Cooperative Management Act ("Fisheries Act"). Medeiros, 431 F.3d at 27; 16

U.S.C. §§ 5101-5108.  The purpose of the Fisheries Act is "to support and encourage the

development, implementation, and <u>enforcement</u> of effective interstate conservation and

management of Atlantic coastal fishery resources."  16 U.S.C. § 5101(b) (emphasis added).

Congress noted that because "no single governmental entity has exclusive management authority

for Atlantic coastal fishery resources, harvesting of such resources is frequently subject to

disparate, inconsistent, and intermittent State and Federal regulation that has been detrimental to

the conservation and sustainable use of such resources and to the interests of fishermen and the

Nation as a whole." 16 U.S.C. § 5101(a)(3).

     The Fisheries Act required ASMFC to prepare and adopt IFMPs providing for the

conservation of coastal fishery resources.  <u>Medeiros</u>, 327 F. Supp. 2d at 147; 16 U.S.C. §

5104(a)(1).  ASMFC develops IFMPs through species specific management boards, in this

particular instance, the American Lobster Management Board ("Board").[1]  <u>See</u> ASMFC Interstate

Fisheries Management Program Charter § 4.  Each state identified in an IFMP is required to

implement and enforce the IFMP's measures, usually through state enacted laws or regulations.

<u>Medeiros</u>, 327 F. Supp. 2d at 147; 16 U.S.C. §§ 5104(b)(1); 5102(10).  ASMFC is responsible

for monitoring a state's implementation and enforcement of IFMPs, <u>Medeiros</u>, 327 F. Supp. 2d at

147; 16 U.S.C. § 5104(c), and is required to provide notice to the United States Secretary of

Commerce of a state's noncompliance with an IFMP.  <u>Medeiros</u>, 327 F. Supp. 2d at 147; 16

U.S.C. § 5105.  If the Secretary of Commerce finds that a state has failed to comply with an

essential term of an IFMP a "moratorium on fishing may be imposed in the offending member

---

[1]The Board conducts ASMFC's resource management planning for the American Lobster.  ASMFC has
delegated authority to the Board to oversee management of the lobster fishery and to develop management measures
to protect the lobster resource.  <u>See generally</u> ASMFC Interstate Fisheries Management Program Charter § 4.

state's coastal waters." Medeiros, 431 F.3d at 28; 16 U.S.C. § 5106(c).

Each member state appoints three representatives to ASMFC and these individuals decide how their state will vote during ASMFC meetings. Compact Article III; Compact Rules and Regulations Article III § 2. The Compact provides that "[n]o recommendation shall be made by the Commission in regard to any species of fish except by the affirmative vote of a majority of the compacting states which have an interest in such species." Compact Article VI. The Fisheries Act and the ASMFC Charter require that fishery management decisions be subject to public disclosure and comment. See 16 U.S.C. § 5104(a)(2)(B); ASMFC Interstate Fisheries Management Program Charter § 6(c); Joseph A. Farside, Jr., Atlantic States Marine Fisheries Commission: Getting a Grip on Slippery Fisheries Management, 11 Roger Williams U. L. Rev. 231, 249 (2005). A "public information document" is prepared for each IFMP or amendment. ASMFC Interstate Fisheries Management Program Charter § 6(c)(3). The public information document contains biological information, fishery issues and potential management options for the IFMP or amendment and is made available to each applicable state "for the purpose of soliciting public comment . . . ." Id. It is the duty of ASMFC and each applicable state to "ensure that the public has an opportunity to review and comment upon the problems and alternative solutions addressed by" the public information document. Id. at § 6(c)(8)(i).

After consideration of the public comments and views developed in response to the public information document, a draft IFMP is prepared. Id. at § 6(c)(5). Upon completion of a draft IFMP or amendment, the ASMFC once again solicits public comment on the draft. Id. at § 6(c)(8)(ii). The ASMFC "will make the draft [IFMP] or amendment and the accompanying [p]ublic [i]nformation [d]ocument widely available to the public, including fishermen,

consumers, government agencies and officials, environmental groups, and other interested parties

throughout the geographic range of the draft [IFMP] or amendment." Id. Public comments are

"evaluated and considered prior to deciding what modifications will be made to the draft [IFMP]

or amendment, or draft final [IFMP] or amendment, and prior to approval of the [IFMP] or

amendment." Id. at § 6(c)(8)(iv). "This procedural measure allows the public in each state to

express whether they would like to be more or less conservative while staying within the

scientifically permissible limits for fishery regulation of that species as determined by the

Commission." Farside, 11 Roger Williams U. Law Rev. at 249.

Amendment 3, Addendum VII and Rhode Island Marine Fishery Regulation 15.14.2-6[2]

In 1997, ASMFC adopted Amendment 3 to the Interstate Fishery Management Plan for

American Lobster. Medeiros, 327 F. Supp. 2d 145. Amendment 3 replaced all previous IFMPs

for the American Lobster and noted that

> [t]he lobster fishery presents a unique dilemma for fishery managers and
> fishermen. Scientific advice is that the fishery is catching too many lobsters the
> first year they shed into legal size. In most areas a high percentage have not had a
> chance to extrude eggs before being harvested. This is the basis for the scientific
> advice that lobsters are overfished and that fishing mortality should be reduced.

Amendment 3 to the Interstate Fisher Management Plan for American Lobster at ii. The goal of

Amendment 3 is to have a "healthy American lobster resource and a management regime which

provides for sustained harvest, maintains appropriate opportunities for participation, and provides

for cooperative development of conservation measures by all stakeholders." Id. at § 2.1. In

---

[2]DEM filed a statement of undisputed facts in support of its motion. See DRI LR Cv 56(a)(1). Plaintiffs
filed an objection and response to DEM's statement of undisputed facts. Plaintiffs, however, did not file a statement
of undisputed facts in support of their own motion for summary judgment. Consequently, the Court is left to decide
the motions based upon the statements filed in support of, and in opposition to, DEM's motion for summary
judgment.

November 2005, ASMFC adopted Addendum VII to Amendment 3. Addendum VII to Amendment 3 is part of a series of efforts by ASMFC to protect the lobster stock in Area 2[3] by imposing limits on fishing activities. Addendum VII contemplates that affected member states will adopt restrictions on lobster fishing by limiting the number of lobster traps based upon an applicant's documented lobster catch during 2001-2003.

During the process of adopting Addendum VII, the Board published a draft Addendum VII setting forth, for public comment and Board consideration, four alternative methods to allocate lobster traps to commercial fishermen. The four methods for allocating lobster traps considered in the draft addendum were to grant trap allocation based on "the (A) highest value of [e]ffective [t]raps [f]ished, during <u>2001-2003</u>"; (B) "highest value of [e]ffective [t]raps [f]ished, during <u>1999-2003</u>"; (C) "highest value of predicted traps fished over three years, <u>2001-2003, based solely on the relationship between pounds reported and maximum traps fished</u>"; and (D) "highest value of predicted traps fished over five years, <u>1999-2003, based solely on the relationship between pounds reported and maximum traps fished.</u>" Draft Addendum VII to Amendment 3 to the Interstate Fishery Management Plan for American Lobster at 6-7 (emphasis in original). Public meetings to discuss the draft Addendum were held in Rhode Island, Massachusetts, Connecticut and New York.

The Board considered draft Addendum VII at its meeting on October 31, 2005. After considering public comment and conducting its own deliberation, the Board voted to approve Addendum VII, specifically adopting option A, granting trap allocation based on the highest value of effective traps fished during 2001-2003.

---

[3]Area 2 includes Massachusetts and Rhode Island state and federal waters.

DEM promulgated its regulatory scheme to bring the state

> into compliance with Addendum VII . . . as adopted by [ASMFC] in November 2005. The purpose of the [regulatory scheme is] to help achieve a healthy and sustainable lobster resource in Area 2 by capping effort at 2001-2003 levels, and establishing a mechanism for future adjustments in effort in response to changes in resource status.

Rhode Island Marine Fisheries Regulation 15.14.2-1 (2007).

The main target of Plaintiffs' complaint is DEM Regulation 15-14.2-6 ("Lobster Trap Allocation Scheme" or "LTA scheme"). Generally, according to the LTA scheme, in order for an applicant to be eligible for lobster trap allocation[4], the applicant must have (1) held a DEM issued commercial lobster license, or a federal lobster permit for Area 2, at some point during 2001-2003; (2) documented lobster landings with traps from Area 2 during 2001-2003; and (3) renewed the license/permit annually since 2003. Rhode Island Marine Fisheries Regulation 15.14.2-6. Plaintiffs acknowledges that DEM "essentially adopted" ASMFC's Addendum VII. Complaint at ¶ 17.

## The Complaint

Plaintiffs' complaint contains eight counts. The first three counts allege that the LTA scheme violates the Rhode Island Constitution, specifically Article I §§ 2, 16[5] and 17. The

---

[4]Individuals are allocated lobster trap access tags and not actual lobster traps.

[5]In count III of the complaint, Plaintiffs allege that the LTA scheme violates Article 1 § 16 of the Rhode Island Constitution. Plaintiffs contend that the LTA scheme denies them a property interest in their fishing licenses without just compensation. Article 1 § 16 of the Rhode Island Constitution provides comparable protection to the Takings Clause of the United States Constitution. Rhode Island Brotherhood of Correctional Officers v. Rhode Island, 264 F. Supp. 2d 87, 102 n.12 (D.R.I. 2003), aff'd, 357 F.3d 42 (1st Cir. 2004). Plaintiffs, however, fail to argue a violation of Article 1 § 16 in their papers in spite of Defendants' argument on the issue. Additionally, in the complaint, Plaintiffs note that Artcile 1 § 2 of the Rhode Island Constitution guarantees due process of law. Complaint at ¶ 43. Plaintiffs, however, do not develop any due process argument in their papers. "[A]n issue raised in the complaint but ignored at summary judgment may be deemed waived." Grenier v. Cyanamid Plastics Inc., 70 F.3d 667, 678 (1st Cir. 1995). Consequently, the Court need not address Plaintiffs' purported takings or due process claims.

9

remaining counts of the complaint allege violations of R.I. Gen. Laws §§ 20-7-9, 20-2.1-9, 42-35-3, 42-35-3.3.

The Alleged State Constitutional Violations[6]

Plaintiffs argue that the LTA scheme denies the individual plaintiffs their fundamental right of equal access to the fisheries as guaranteed by Article 1 § 17 and denies them equal protection of the laws in violation of Article 1 § 2 of the Rhode Island Constitution. Plaintiffs argue that by adopting a regulatory scheme that allocates lobster traps based on lobster landings during a three year period, DEM has denied Plaintiffs their right of equal access to the fisheries and equal protection of the laws. Specifically, Plaintiffs allege that the LTA scheme arbitrarily denies a group of citizens, namely those commercial fishing license holders who did not land a substantial catch or any catch of lobster while using their lobster traps from 2001 to 2003, of their right of equal access to the fisheries and equal protection. DEM avers that the LTA scheme is a valid regulatory restriction imposed to protect and conserve the state's fisheries.

Plaintiffs carry the burden of proving beyond a reasonable doubt that the regulations violate the Rhode Island Constitution. Riley v. Rhode Island Department of Environmental Management, 941 A.2d 198 (R.I. 2008). This Court must exercise the "greatest possible caution" in reviewing the question of the constitutionality of a legislative act as there is a presumption that the legislative act is valid. Id. at 204 (internal quotation marks and citation omitted).

Plaintiffs attempt to trigger the Court's strict scrutiny review of the LTA framework by

---

[6]Plaintiffs challenge the constitutionality of regulations adopted by DEM. The regulations were promulgated by DEM pursuant to specific authority granted to it by the General Assembly. See generally R.I. Gen. Laws §§ 42-17.1-1; 42-17.1-2; 20-1-2; 20-1-4; see also Parkway Towers Associates v. Godfrey, 688 A.2d 1289 (R.I. 1997). Thus, the regulations are "legislative rules that carry the force and effect of law. . . ." Id. at 1293.

alleging that the regulations implicate Plaintiffs' fundamental right of equal access to the

fisheries. See generally R.I. Const. art. I, § 17; Cherenzia v. Lynch, 847 A.2d 818, 824 (R.I.

2004) (if a "statute or regulation contained restrictions that infringed upon the fundamental right

of the inhabitants of the state to have equal access to the 'rights of fishery,' then such a regulation

or law would be subject to strict scrutiny analysis"). Thus, in passing on the constitutionality of

the LTA scheme, the threshold question that the Court must answer is whether a fundamental

right is at stake. Riley, 941 A.2d at 205-06. If a fundamental right is at stake, the legislative act

is subject to strict scrutiny. Id. at 206. If no fundamental right is at stake and no suspect class is

implicated, the Court's review is through a "minimal-scrutiny" lens. Id. Plaintiffs do not argue

that a suspect class is involved in this matter, thus the Court's first task is to determine whether

the fundamental right of equal access to the fishery, that is, R.I. Const. art. I, § 17, is implicated.

The right of fishery has "deep historical roots" in the state of Rhode Island. Riley, 941

A.2d at 207. In 1842, the Rhode Island Constitution was ratified and it incorporated the rights of

fishery from the Royal Charter granted by King Charles II. Id. at 208. In 1970, the right of

fishery was "augmented . . . with an amendment entitled 'Conservation,' in which [certain]

provisions with respect to the right of fishery were annulled and replaced." Id. The formidable

and compelling challenge of providing equal access to Rhode Island's natural resources in light

of protecting those resources for future generations is reflected in Rhode Island's constitutional

provision outlining the rights of fishery:

> The people shall continue to enjoy and freely exercise all the rights of
> fishery, and the privileges of the shore, to which they have been heretofore
> entitled under the charter and usages of this state, including but not limited to
> fishing from the shore, the gathering of seaweed, leaving the shore to swim in the
> sea and passage along the shore; and they shall be secure in their rights to the use

11

and enjoyment of the natural resources of the state with due regard for the preservation of their values; <u>and it shall be the duty of the general assembly to provide for the conservation of the air, land, water, plant, animal, mineral and other natural resources of the state, and to adopt all means necessary and proper by law to protect the natural environment of the people of the state by providing adequate resource planning for the control and regulation of the use of the natural resources of the state and for the preservation, regeneration and restoration of the natural environment of the state.</u>

R.I. Const. art. I, § 17 (emphasis added); <u>see also</u> <u>Riley</u>, 941 A.2d at 209 (describing the area that lies between the public's right of fishery and the General Assembly's duty to preserve that right as "thorny").

"The scope of the fundamental right protected in art. I, sec. 17, is that all the inhabitants of the state shall continue to enjoy and freely exercise equal access to the state's fishery resources." <u>Cherenzia</u>, 847 A.2d at 823 (internal quotation marks and footnote omitted). The right of fishery belongs to the general public and to no particular individual; commercial fishermen have no peculiar rights to the fishery. <u>Riley</u>, 941 A.2d at 208. The right of fishery, however, is qualified by the Rhode Island General Assembly's duty to preserve, regenerate, and conserve the state's natural resources through proper resource planning. <u>Id.</u> "[L]egislative restriction is indispensable to secure to the public the benefit of the . . . fishery and effectuate the intended scope of the constitutional right." <u>Cherenzia</u>, 847 A.2d at 824 (internal quotation marks and citation omitted).

It is for the Legislature to make such laws, regulating and governing the subject of lobster-culture, oyster-culture, clam culture or any other kind of pisciculture, as they may deem expedient. They may regulate the public or private fisheries. <u>They may even prohibit free fishing for a time and for such times as in their judgment it is for the best interest of the state to do so.</u> They may withhold from the public use such natural oyster beds, clam beds, scallop beds or other fish beds as they may deem desirable. They may make a close time within which no person may take shell-fish or other fish, and generally they have complete dominion over

12

fisheries and fish . . . .   We find no limitation, in the Constitution, of the power of
the General Assembly to legislate in this regard, and they may delegate the
administration of their regulations to such officers or boards as they may see fit.

Opinion to the Senate, 137 A.2d 525, 526 (R.I. 1958) (internal quotation marks and citation

omitted and emphasis in original).  The General Assembly's power, in this regard is "plenary . . .

and is no longer open to question."  Id.  Thus, construed in its entirety, R.I. Const. art. 1, § 17

grants a right of fishery to the public but leaves broad discretion to the General Assembly to

adopt appropriate and reasonable conservation measures.  See generally id.; Cherenzia, 847 A.2d

at 824.  The General Assembly's constitutional responsibility includes "regulating the methods

by which fishing may occur."  Id. at 826.

Plaintiffs argue that the LTA scheme allows for some commercial fisherman to fish for

lobsters while barring other commercial fisherman from doing the same.  Plaintiffs aver that the

Rhode Island Constitution does not "permit the adoption of such discriminatory regulations by

DEM."  Plaintiffs Memorandum of Law in Support of Complaint for Declaratory Judgment and

Motion for a Preliminary Injunction at 8.  Plaintiffs claim that there are "groups of commercial

fishermen who have the same licenses to fish commercially, yet some are wholly excluded from

fishing for a valuable resource, lobster, based on arbitrary historic landings."  Id. at 8-9.

Plaintiffs conclude that the LTA scheme implicates the fundamental right of fishery because it

denies a particular group of persons equal access to the fisheries, specifically, those commercial

fisherman who cannot demonstrate significant or any trap landings from 2001-2003.  Plaintiffs

argue that the LTA scheme is unreasonable, arbitrary and contrary to law.  DEM, not

surprisingly, maintains the position that the regulatory scheme is an appropriate and reasonable

conservation measure.

13

The Rhode Island Supreme Court faced an analogous fundamental right argument in Riley. The issue in Riley was whether the "Rhode Island Constitution's guarantee of right of fishery prohibit[ed] the Legislature from granting some commercial fishermen access to some species of sea life while denying others the same right?" Riley, 941 A.2d at 201. In Riley the plaintiff applied for a principal effort commercial fishing license which would have given him access to Rhode Island's most valuable sea life. Riley, 941 A.2d at 202. The General Assembly, however, had enacted legislation that allowed DEM to place restrictions on the number of licenses holders. Id. at 203. According to that legislation, in order to get the preferential license, plaintiff had to be licensed in the particular fishery as of the previous December 31. Id. Because he did not have the particular fishery license on the previous December 31, plaintiff was denied the preferential license he desired but he was granted a "less lucrative commercial fishing license. . . ." Id. at 203. The salient issue in Riley was whether the legislation denying plaintiff the more lucrative fishing license implicated the fundamental right to fishery, denied him equal protection of the laws and violated his due process rights under the Rhode Island and United States Constitutions. Id. at 202.

Plaintiffs maintain a strikingly similar position to the plaintiff in Riley, that is, that the LTA scheme "only allows for some commercial fishermen to be eligible to take these restricted species, and a [regulation] that permit[s] one class of citizens to take these fish while prohibiting entirely the taking thereof by another class of citizens . . . is invalid as discriminatory." Riley, 941 A.2d at 210 (internal quotation marks and citation omitted). Plaintiffs argue that "this is a situation in which a class of individuals, those without [significant or any trap landings during the control period] has been denied equal access to [the] fishery . . . ." Id. Plaintiffs, in essence,

14

argue that "either everyone is permitted to harvest the same species, or no one is." Id.

This Court finds Riley controlling; Plaintiffs cannot escape Riley's net. The licensing scheme in Riley and DEM's regulatory scheme have similar characteristics. Both schemes are based on the premise that in order to receive a license or trap allocation an applicant must have been active in the fishery at a relatively recent point in time. Riley specifically rejected Plaintiffs' argument that the LTA scheme implicates the fundamental right of fishery. Riley reiterated the Rhode Island Supreme Court's holding that no "fundamental right is implicated when the General Assembly enacts legislation for the "good of the whole," even when it has been at the expense of a few." Id. (footnote omitted). Riley affirmed that the Rhode Island Supreme Court had "never . . . held that a fundamental right of fishery has been implicated and applied strict scrutiny to such regulations." Id. Furthermore, Plaintiffs readily admit that the LTA scheme only prohibits them from "fishing for lobster by way of pot traps." Plaintiffs Memorandum in Support of Cross Motion for Summary Judgment at 4 (emphasis added). Plaintiffs have no fundamental right to harvest lobster using a specific method of fishing. Cherenzia, 847 A.2d at 824. With the benefit of Riley, this Court concludes that the LTA scheme does not offend Article 1 § 17 of the Rhode Island Constitution; thus no fundamental right of fishery is implicated in this matter.

### Equal Protection

Based upon the Court's conclusion that the LTA scheme does not implicate the fundamental right of fishery, Plaintiffs' argument that the scheme is subject to strict scrutiny must fail. See generally Riley, 941 A.2d at 211. In an equal protection analysis, if legislative classifications do not impact a fundamental right or a suspect class such as race, national origin

15

or alienage, those classifications are examined through a minimal scrutiny lens. Id.  A

legislative act will survive minimal scrutiny if a rational relationship exists between the

legislative act and a legitimate state interest. Riley, 941 A.2d at 206.  To determine whether a

rational relationship exists, the Court must look to whether the General Assembly could have

rationally concluded that the legislative act would resolve a legitimate problem. Mackie v. State,

936 A.2d 588, 596 (R.I. 2007).  If the Court can conceive of "any reasonable basis to justify the

classification," the legislative act does not offend the Rhode Island Constitution. Riley, 941 A.2d

at 206.  "[T]o overcome the presumption of validity, a party seeking to attack a [legislative]

classification has the burden to negate every conceivable basis which might support it." State v.

Faria, 947 A.2d 863, 868 (R.I. 2008) (internal quotation marks and citation omitted and emphasis

in original).  This burden is a "heavy" one. Mackie, 936 A.2d 598.  The legislative act fails the

rational relationship test only if the act "rests on grounds wholly irrelevant to the achievement of

the State's objective. . . ." Rhode Island Depositors Economic Protection Corp. v. Brown, 659

A.2d 95, 101 (R.I. 1995).

Plaintiffs argue that the LTA retroactive control dates, the period from 2001-2003, are

arbitrary and capricious and bear no rational relationship to DEM's interest in protecting the Area

2 lobster population.  Plaintiffs conclude that because the control dates impermissibly protect and

insulate one group and exclude those already licensed with equal expectations to be able to fish

the resource, the LTA scheme is not rationally related to the goal of protecting the lobster

population.

DEM avers that the LTA scheme is rationally related to the goal of conservation because

Rhode Island adopted the regulations to implement the state's obligations pursuant to the

16

Compact. DEM argues that the LTA scheme is rationally related to the goal of conservation because the regulations were based on Addendum VII which was the result of an exhaustive ASMFC process, including extensive hearings and public comment. DEM avers that Addendum VII was intended to fulfill conservation objectives while also protecting the interests of fishermen most likely to be adversely affected by limitations on the fishery, those who had been most active during a recent three year period. DEM avers that the regulations are part of an interstate management regime that safeguards a valuable marine resource that straddles state boundaries. DEM concludes that the LTA scheme is an appropriate and rational measure to conserve and protect a valuable natural resource. The parties agree that conservation of the lobster population, a natural resource, is a legitimate governmental goal.

The purpose of the LTA scheme is to "help achieve a healthy and sustainable lobster resource in Area 2 by capping effort at 2001-2003 levels, and establishing a mechanism for future adjustments in effort in response to changes in resource status." Rhode Island Marine Fisheries Regulation 15.14.2-1. It is undisputed that DEM adopted the LTA scheme as a result of ASFMC's adoption of Addendum VII. Plaintiffs readily admit that DEM "essentially adopted" Addendum VII. Complaint at ¶ 17. The Court, therefore, also looks to the purpose and regulatory process of Addendum VII to address the parties' arguments.

In February 2004 the Board approved Addendum VI to Amendment 3 – which required all jurisdictions with Area 2 permit holders to develop a new plan which "would cap effort at or near current levels with the potential to adjust the levels based upon the outcome of" a stock assessment. Addendum VII to Amendment 3 to the Interstate Fishery Management Plan for American Lobster at 2. In April 2005, the Lobster Conservation Management Team ("LCMT")

submitted to the Board a proposed set of management measures to address a new fishing effort control plan.[7]   A central feature of the proposal was a control program that would limit the allocation of traps based on fishing history for the purpose of limiting catch and rebuilding the fishery.  The central issue that the Board had to resolve, however, was the choice of the particular reference period, i.e., the "performance years" or "control period" to establish the relevant fishing history.  The LCMT determined that the choice of a short recent control period would capture attrition in the lobster fishery, however, basing the control period on only a single recent year could have a disparate impact on fishermen with poor performance in the most recent year.  At the other extreme, however, the LCMT determined that using extended control periods of up to 5 years would fail to capture the fisheries recent attrition, which was a significant part of the conservation plan.

As noted above, in October 2005, the Board considered draft Addendum VII and approved it, including the 2001-2003 control period for trap allocation.  The purpose of Addendum VII was to

> establish a multi-state effort control program for . . . Area 2 that governs traps fished in state and federal waters to cap effort (traps fished) at recent levels and allows adjustments in traps based on future stock conditions.  Th[e] plan attempts to capture the attrition from the fishery, caused by stock decline, thereby preventing a return of overall fishing levels to historic highs of the late 1990's.  Th[e] plan limits participation to permit holders who have been active in the fishery in recent years, creates permit-holder specific trap limits that are unique based on reported traps fished and landings . . . .

Addendum VII to Amendment 3 to the Interstate Fishery Management Plan for American Lobster

---

[7]Amendment 3 created Lobster Conservation Management Teams for seven lobster management areas. LCMTs are comprised of industry representatives appointed by the states, state fishery managers, and other federal agency representatives.  LCMTs advise the Board and recommend changes for each specific area to fulfill the goals of the IFMPs while taking into account local fisheries practices.

at § 3.0 (emphasis added).  The core goal of Addendum VII was protection of the lobster

population in Area 2 by limiting traps fished to recent levels while allowing for adjustments in

traps allocated based upon future stock conditions.  Addendum VII established a fishery wide

overall trap allocation cap constituting the maximum number of traps allocated among all permit

holders in Area 2.  Id. at § 4.1.1.3.  If overall initial trap allocations exceeded the overall trap

allocation cap, each permit holder's trap allocation would be reduced by a specific percentage to

reach the trap allocation cap.  Id. at 4.2.1.2.  If, however, after a stock assessment, further trap

reductions are warranted, each permit holder's trap allocation would be reduced by a percentage

(fishery wide) to meet trap allocation goals.  Id.

In adopting Addendum VII,  the Board chose 2003 – a year reflecting the recent attrition

in the lobster fishery – as the target level of fishing effort that was consistent with conservation

objectives.  Id. at § 4.2.1.  The Board considered four options to allocate traps, and chose a

control period dependent upon an individual fishermen's history in 2001-2003.  The four options

included in draft Addendum VII were considered by the Board and subject to public comment.

Draft Addendum VII noted that the 2001-2003 control period was the most conservative of the

four options and was predicted to exceed the 2003 level of fishing effort (traps fished) by 23%.

See Draft Addendum VII to Amendment 3 to the Interstate Fishery Management Plan for

American Lobster at 4.2.1.1.  The other options were predicted to exceed the 2003 target level of

fishing effort by anywhere between 47% to 87%.  See id.

The 2001-2003 control period identified those fishermen who had the most at stake in the

fishery – those who had remained active in the fishery.  See generally Riley, 941 A.2d at 213.

(noting that the General Assembly "has proper concern for the economic viability of the industry

as a whole, and in particular, for those individuals who have the most at stake within it"). The record reflects that the General Assembly could have concluded that the 2001-2003 control period was not "wholly irrelevant" to the goal of conserving the lobster resource because (1) the control period was predicted to exceed the target 2003 level of fishing effort by the least of the four alternatives; (2) the control period appropriately considered the recent attrition in the fishing industry; and (3) the control period considered the direct impact on those individuals with the most at stake in the industry – those who were most active. See generally Brown, 659 A.2d at 101. Furthermore, limiting licenses is not "wholly irrelevant" to conserving the natural fishery resource. Id.; see generally Riley, 941 A.2d at 211 (limiting licenses in relation to the condition of the species and then allocating those licenses based on who was there first is not discriminatory or invidious).

> Without protection from the rapacity of man, lobsters [will] become scarcer and consequently dearer . . . . The natural tendency to kill the goose that lays the golden egg is always exhibited when the opportunity is afforded . . . . [M]an should be saved from the consequences of his own selfishness, thoughtlessness, and wastefulness in the matter of fisheries. And for this purpose an ounce of prevention is worth a pound of cure.

Riley, 941 A.2d at 213 (internal quotation marks and citation omitted). The 2001-2003 control period is rationally related to the goal of conservation of the lobster fishery.[8]

### The Non-Constitutional Claims

Plaintiffs next challenge that portion of the DEM regulatory scheme that provides that "[d]ocumented fishing performance shall be based upon a license/permit holder's logbook

---

[8]In their papers, it appears that Plaintiffs attempt to challenge the validity and/or wisdom of Addendum VII. In their complaint, however, Plaintiffs do not assert any claims against ASMFC or allege that Addendum VII is invalid.

20

reports . . . pertaining to the applicable qualifying period." Rhode Island Marine Fisheries

Regulation 15.14.2-6(c). Plaintiffs argue that the provision is a clear violation of R.I. Gen. Laws

§ 20-7-9 because the logbooks are being used to determine which individuals receive a license to

fish for lobster by trap. DEM argues that the regulation does not offend the plain statutory

language of § 20-7-9.

In dealing with a question of statutory construction the Court looks to the "plain and

ordinary meaning of the statutory language." State v. Greenberg, 951 A.2d 481, 489 (R.I. 2008).

"If the language is clear on its face, then the plain meaning of the statute must be given effect and

[the] Court should not look elsewhere to discern the legislative intent." Id. (internal quotation

marks and citation omitted). Only if a statute is susceptible of more than one meaning does the

court employ the "well-established maxims of statutory construction in an effort to glean the

intent of the Legislature." Town of Burrillville v. Pascoag Apartment Associates, LLC., 950

A.2d 435, 445 (R.I. 2008) (internal quotation marks and citation omitted).

Section 20-7-9 provides that

> [f]or the purposes of determining whether the number of lobsters caught in the
> waters of this state are increasing or decreasing during any period, every person
> licensed pursuant to § 20-2-24 to catch, take, and/or sell lobsters in Rhode Island
> shall, upon request of the department of environmental management, report catch
> and effort statistics upon forms furnished by the department. The returns from
> any person shall not be made public, shall be kept only in the files of the
> department, and shall be used only for statistical purposes.

R.I. Gen. Laws § 20-7-9 (emphasis added). Plaintiffs argue that the statute prohibits the use of

logbooks except for statistical purposes. Plaintiffs aver that the plain and ordinary meaning of

the phrase "statistical purposes" does not include using the information to determine who will

receive an allocation of lobster traps. DEM counters that the provision does not offend § 20-7-9

21

because the regulation simply provides for the application of statistical data to calculate the appropriate lobster trap allocation based upon the applicant's individual history of activity in the lobster fishery.

Plaintiffs argue that the "plain meaning of [the phrase] 'statistical purposes,' . . . is use of the lobster catch report data for tracking species to determine whether future conservation measures must be enacted to protect those species." Plaintiffs Memorandum of Law in Support of Cross Motion for Summary Judgment at 8. Plaintiffs argue that the authors of the regulation "certainly did not contemplate using the catch reports to punish fishermen who honestly reported low catch numbers or none based upon redirected fishing effort into more abundant fisheries during the chosen control periods. Had they meant it to have such use they could have so stated." Id. Plaintiffs' view is clouded by their perception of the regulations as punishment. The regulations were not adopted as punishment; they were adopted as a rational response to the dwindling lobster population and concerns for future protection of the lobster fishery, in essence, to "secure to the public a more abundant supply" of lobsters. State v. Cozzen, 2 R.I. 561, 564 (1850). Consequently, the log books were used in a manner consistent with the plain meaning of the phrase "statistical purposes" as used in § 20-7-9; as an important data component in the process of tracking species to determine whether conservation measures must be enacted to protect a species. Rhode Island Fisheries Regulation 15.14.2-6(c) does not violate R.I. Gen. Laws. § 20-7-9.

Plaintiffs next argue that the Director of DEM acted contrary to R.I. Gen. Laws § 20-2.1-9(4)(ii) by adopting a regulatory scheme that uses retroactive control dates to determine the allocation of lobster traps. Plaintiffs aver that R.I. Gen. Laws § 20-2.1-9(4)(ii) prohibits the

Director from adopting retroactive control dates unless "expressly required by federal law, regulation or court decision." R.I. Gen. Laws § 20-2.1-9(4)(ii). It is Plaintiffs' position that Rhode Island was not obligated to implement the requirements of Addendum VII (specifically the retroactive control dates) and could have adopted a different regulatory scheme that would have met the same conservation goals of Addendum VII but would not have offended state law. DEM argues that Rhode Island was obligated to adopt Addendum VII and its corresponding retroactive control dates.

This Court has previously decided that to determine whether or not Rhode Island must strictly comply with Addendum VII, the Court must look to Rhode Island's and ASMFC's rights and obligations pursuant to the Compact and its progeny: the Fisheries Act and any applicable regulations and/or procedures. See Rhode Island Fishermen's Alliance Inc. v. The Department of Environmental Management, C.A. No. 07-230ML (D.R.I. Nov. 5, 2007). The ASMFC Interstate Fishery Management Program Charter provides that "[a]ll states are responsible for the full and effective implementation and enforcement of fishery management plans within areas subject to their jurisdiction." ASMFC Interstate Fisheries Management Program Charter § 7(a) (emphasis added). Member states are required to report on compliance with the required measures of a IFMP. Id. At any time, the ASMFC "may determine that a State is not fully and effectively implementing and enforcing the required provisions of a fishery management plan, and is therefore not in compliance with the plan." Id. Each state identified in an IFMP is required to implement and enforce the IFMP's measures, usually through state enacted laws or regulations. Medeiros, 327 F. Supp. 2d at 147; 16 U.S.C. §§ 5104(b)(1); 5102(10). ASMFC is required to provide notice to the United States Secretary of Commerce of a state's

noncompliance with an IFMP. <u>Medeiros</u>, 327 F. Supp. 2d at 147; 16 U.S.C. § 5105.  If the

Secretary of Commerce finds that a state has failed to comply with an essential term of an IFMP

a "moratorium on fishing may be imposed in the offending member state's coastal waters."

<u>Medeiros</u>, 431 F.3d at 28; 16 U.S.C. § 5106(c).

      The lynchpin of Plaintiffs' argument is that Addendum VII provides for "conservation

equivalency," a mechanism in Amendment 3 that allows a member state to propose, subject to

ASMFC approval, an alternative means of complying with a IFMP. Amendment 3 provides, in

part, that a

> state may not change its regulatory program except with the approval of the
> Board. . . .  A state can request a change only if that state can show to the Board's
> satisfaction that the target egg production will be achieved.  Changes to state plans
> must be submitted in writing to the Board and to the ASMFC.

Amendment 3 to the Interstate Fishery Management Plan for American Lobster at § 3.5.

Amendment 3 dictates that a state may propose a change to its regulatory program by submitting

a proposal to the Board and the Board "will decide whether to approve the state proposal for an

alternative management program if <u>it determines that it is consistent with the target fishing</u>

<u>mortality rate then applicable, and the goals and objectives of this amendment.</u>" <u>Id.</u> at § 3.5.1

(emphasis added).

      Plaintiffs argue that the mere possibility of obtaining approval for an alternative program

means that the terms of Addendum VII are not mandatory.  The clear language of Amendment 3

provides that a state may request a change to an IFMP by submitting a proposal to the Board.

The Board may approve a conservation equivalency proposal if it finds that the proposal is

consistent with the governing fishing mortality target, <u>and</u> if the proposal meets the goals and

objectives of Amendment 3. Id. As noted above, the goal of Amendment 3 is to have a "healthy American lobster resource and a management regime which provides for sustained harvest, maintains appropriate opportunities for participation, and provides for cooperative development of conservation measures by all stakeholders." Id. at § 2.1. Amendment 3 also contains 11 separate and distinct objectives. Id. at § 2.2. Plaintiffs did not identify, to DEM nor to this Court, a specific concrete alternative plan.[9] As a result, Plaintiffs have failed to identify any undisputed fact that would support the premise that its hypothetical plan is consistent with the fishing mortality target set by ASMFC or whether its hypothetical plan meets the goals and objectives of Amendment 3. As a result of this misstep, Plaintiffs have presented no evidence that would show that ASMFC would have approved Plaintiffs' hypothetical plan. Plaintiffs have not asserted any specific claim against ASMFC nor have Plaintiffs identified any applicable law that would require ASMFC to approve a hypothetical conservation equivalency plan.

According to the Compact and its progeny, IFMPs must be implemented unless a state pursues the exceptional circumstance of proposing a specific alternative plan that meets specific and select requirements – most significant – that the alternative plan would be approved by the Board. The mere possibility of obtaining approval for an alternative plan based upon conservation equivalency does not render compliance with a IFMP optional. As the language of Amendment 3 makes clear, conservation equivalency is a discretionary device by which the

---

[9]Plaintiffs argue that they presented conservation equivalency proposals to DEM. In support, Plaintiffs point to two affidavits they submitted with their motions. Those affidavits, however, are conclusory and merely suggest broad alternatives to Addendum VII and do not support the factual assertion that DEM was presented with a definite plan that would meet the specific requirements for conservation equivalency according to Amendment 3. "It is well settled that a plaintiff aggrieved by a state agency's action must first exhaust administrative remedies before bringing a claim in court." Rhode Island Employment Security Alliance v. Rhode Island, 788 A.2d 465, 467 (R.I. 2002).

Board may authorize alternative measures that have equivalent conservation benefits and that satisfy the goals and objectives of Amendment 3. The record before the Court is clear; Rhode Island did not submit an alternative plan and Plaintiffs have not presented any evidence identifying a *particular* alternative plan. By failing to identify any distinct alternative plan, Plaintiffs have failed to show that the plan would have met the same fishing mortality target of Amendment 3 and its goals and objectives. Consequently, the record mandates one conclusion; Rhode Island was obligated to implement Addendum VII, and its corresponding control dates, as a result of its membership in the Compact.[10]

Plaintiffs next argue that the LTA scheme violates R.I. Gen. Laws § 42-35-3.3(a). Plaintiffs argue that DEM failed to consider conservation alternatives that would minimize adverse impact on small businesses. Plaintiffs aver that their small businesses have been effectively disabled and disenfranchised as a direct result of the regulatory scheme. R.I. Gen. Laws § 42-35-3.3(a) provides, in part that

> [p]rior to the adoption of any proposed regulation each agency shall notify the governor's office and the economic development corporation of its intent to adopt the proposed regulation. The agency shall submit the proposed regulation to both the governor's office and the economic development corporation at a time reasonably in advance of the commencement of the formal rule making process . . . . If the governor's office or the economic development corporation shall, within fifteen (15) days of receipt of such notice, identify a proposed regulation as one that may have a significant adverse economic impact on small businesses, the proposing agency shall prepare a regulatory flexibility analysis in which the agency shall, where consistent with the health, safety and environmental and
>
> economic welfare, consider utilizing regulatory methods that will accomplish the

---

[10]Plaintiffs' argument that the Board has approved conservation equivalency alternatives on other occasions for other states misses the mark. It is undisputed that the Board has the authority to approve alterative measures pursuant to the requirements of Amendment 3. Prior approval of alternative plans in unrelated instances does not support the conclusion that compliance with an IFMP is not mandatory in this particular instance.

objectives of applicable laws while minimizing adverse impact on small business.
The small business advocate shall identify and convey specific concerns raised by
small business in providing notice to the agency proposing the regulation, and
shall, when appropriate, act as an advocate for a small business raising concerns . .
..

R.I. Gen. Laws § 42-35-3.3(a) (emphasis added).  The Court disposes of Plaintiffs' argument in

quick form.  First, Plaintiffs do not present the Court with any evidence that the governor's office

or the economic development corporation notified DEM that the proposed regulatory scheme had

an adverse impact on small business.  More significant, however, is that section 42-35-3.3(a) also

provides that to "the extent that a proposed regulation is required to be promulgated by a state

agency in order to comply with a requirement for the establishment of specific standards under

federal law, such regulations . . . shall not be subject to the requirements of this section ."  Id.

(emphasis added).  Because the Court has concluded that the state of Rhode Island was obligated

to adopt the regulatory scheme pursuant to federal law, the provisions of R.I. Gen. Laws § 42-35-

3.3(a) do not apply to this matter and Plaintiffs' argument is unavailing.

Plaintiffs next argue that the LTA scheme violates R.I. Gen. Laws § 42-35-3(a)(3).

Section 42-35-3(a)(3) provides, in part, that before adopting any rule DEM shall

> [d]emonstrate the need for the adoption, amendment, or repeal of any rule in the
> record of the rulemaking proceeding.  The agency shall demonstrate that there is
> no alternative approach among the alternatives considered during the rulemaking
> proceeding which would be as effective and less burdensome to affected private
> persons as another regulation.

R.I. Gen. Laws § 42-35-3(a)(3) (emphasis added).  Plaintiffs argue that prior to adopting the

regulatory scheme DEM failed to demonstrate that there were no equally effective and less

burdensome alternatives.  Plaintiffs again argue that DEM's failure to consider conservation

27

equivalency alternatives violated section 42-35-3(a)(3).

DEM's discretion was limited as a result of Rhode Island's membership in the Compact. ASMFC had identified the problem and considered a number of alternatives to address the problem. DEM's primary focus was limited to the adoption of a regulatory scheme that would implement the plan adopted by ASMFC. Any alternative scheme that DEM could consider would have had to comply with the conservation equivalency requirements of Amendment 3. DEM advised the public of the potential impact on small business and requested comments concerning how the proposed regulations could be changed to minimize the impact on small business. DEM did not receive any alternative proposals by which it could comply with Addendum VII. Rhode Island was obligated to adopt the regulatory scheme and Plaintiffs have not identified any less burdensome hypothetical conservation equivalency plan that would meet the requirements of Amendment 3. Consequently, the record reflects that DEM did not violate section 42-35-3(a)(3) by implementing the LTA scheme.

Plaintiffs also argue that Rhode Island Marine Fisheries Regulation 6.7-8(a), entitled "Issuance of New Licenses Upon Sale of Vessel and Gear" violates R.I. Gen. Laws § 20-2.1-9 because Rhode Island law does not grant the Director of DEM the power to create and/or transfer rights of access to the public marine resource. Regulation 6.7-8(a) provides, in part, that "if the seller of a vessel and gear who is actively fishing his or her license shall have first surrendered it to the Department, the Department will, upon application, issue one new license to the purchaser of the vessel and gear, pursuant to the terms and conditions of this section." Rhode Island Marine Fishery Regulation 6.7-8(a). It is Plaintiffs' position that regulation 15.14.2-11 entitled

28

"Transfer of Area 2 LTAs" is "proof of [DEM's] intention to provide for transferability of Area 2 LTAs among permit holders." Complaint ¶ 69 (emphasis added). Plaintiffs argue that through the regulation, the Director of DEM is creating a private property right of access to marine resources allowing private individuals to determine who may have access to a public resource based on sale to the highest bidder. Plaintiffs readily admit, however, that this allegation is based on what it views as DEM's intent with regard to a purported program to transfer licenses. Plaintiffs acknowledge that no final regulation has been promulgated by DEM authorizing the transfer of a lobster trap allocations but argue that "space for such a regulation has been reserved at RIMFR Part 15.14.2-11 . . . and public hearings have been conducted on the issue of transferability." Plaintiffs Memorandum of Law in Support of Cross Motion for Summary Judgment at 6. Plaintiffs argue that the threat of injury is sufficiently immediate because DEM "will likely promulgate transferability regulations in the near future. . . ." Id. at 7. It is undisputed that no final regulation has been promulgated by DEM providing for the transferability of lobster trap allocations. Plaintiffs' argument on this point is clearly premature. See Farber v. City of Newport, 51 F. Supp. 2d 115 (D.R.I. 1999) (court lacked jurisdiction over claim concerning a prospective action because the claim was not ripe).

Although the Court is not unsympathetic to the plight of those individuals who may suffer adverse consequences as a result of implementation of the regulatory scheme, the record reflects that the challenged DEM regulations do not offend the Rhode Island Constitution or Rhode

Island law.  Accordingly, Plaintiffs' motion for summary judgment is DENIED and DEM's

motion for summary judgment is granted.[11]

SO ORDERED.


_Mary M. Lisi_

Mary M. Lisi
Chief United States District Judge
October *3* , 2008

\

---

[11]As noted, Plaintiffs have also filed a motion for preliminary injunction and declaratory judgment.  The factors a movant must show so that a preliminary injunction will issue are well settled: (1) a likelihood of success on the merits; (2) irreparable harm; (3) comparison between harm to the movant if no injunction issues and harm to the objector if an injunction issues; and (4) how issuing or not issuing an injunction will impact the public interest.  New Comm Wireless Services, Inc. v. Sprintcom, Inc., 287 F.3d 1 (1st Cir. 2002).  "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."  Id. at 9.  Since the Court has denied Plaintiffs' motion for summary judgment and granted DEM's motion for summary judgment, it is a foregone conclusion that Plaintiffs have failed to show a likelihood of success on the merits.  Consequently, Plaintiffs' motion for a preliminary injunction and declaratory judgment is DENIED.